[Cite as *State v. Underwood*, 2024-Ohio-2273.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

STATE OF OHIO,

:

Plaintiff-Appellee,

:

Case No. 21CA3974

:

v.

:

:

DUSTIN L. UNDERWOOD,

:

DECISION AND JUDGMENT
ENTRY

:

Defendant-Appellant.

:

**RELEASED 6/11/2024**

_____

APPEARANCES:

Karyn Justice, The Law Office of Karyn Justice, LLC, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, Matthew F. Loesch, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.
_____

Hess, J.

{¶1} Dustin L. Underwood appeals his conviction for voluntary manslaughter and aggravated assault. Underwood raises five assignments of error challenging: (1) the trial court's provision of jury instructions; (2) the sufficiency and manifest weight of the evidence supporting his convictions; (3) the effectiveness of his trial counsel; (4) the lawfulness of his sentence; and (5) cumulative error. We find no merit to Underwood's arguments, overrule his assignments of error, and affirm the trial court judgment.

I.      FACTS & PROCEDURAL HISTORY

{¶2} In November 2020, the Scioto County grand jury indicted Underwood on three counts: (1) Murder in violation of R.C. 2903.02(B), R.C 2903.02(D), and R.C. 2929.02(B); (2) Voluntary Manslaughter in violation of R.C. 2903.03(A) and

R.C. 2903.03(C); and (3) Felonious Assault in violation of R.C. 2903.11(A)(1) and R.C. 2903.11(D)(1)(a). The murder and manslaughter counts included a firearm specification under R.C. 2941.145(A). Underwood pleaded not guilty, and the matter proceeded to a jury trial.

{¶3} The Scioto County Sheriff's Office Dispatcher testified that on the morning of February 3, 2020, the Scioto County Sheriff's Department received three 9-1-1 calls relating to a disturbance at 124 Wallace Road in rural Scioto County. A neighbor, Rod Taylor, called and described a "gunshot victim laying in the yard, suspects left in a silver sedan." After Taylor's call, Dustin Underwood called and stated that Lonnie Elliott[1] shot Sabrina Gilbert[2] in the chest. Underwood was driving Sabrina to Pike County Hospital. They were in a silver Honda on S.R. 32 east. Underwood and Sabrina had two sons, Devyn and Dylan Underwood, who were also with them. The neighbor, Taylor, called back to report that they were still waiting on an ambulance. Taylor added that Elliott had been shot in the head and chest, though later the evidence would reveal that Elliott had been severely beaten in the head and chest, but not shot. Taylor stated, "It looks like they beat him real bad too. * * * It was the people that lived down the hill from him." The 9-1-1 calls were played for the jury.

{¶4} Corporal Jonathan Chandler of the Pike County Sheriff's Office testified that on February 3, 2020, his office received a call of a possible shooting near the Pike and Scioto County lines. While enroute to the scene, Chandler

---

[1] The assault victim, Lonnie "Gabe" Elliott, is referred to in the record as "Lonnie" or "Gabe." We refer to him as "Elliott."

[2] The shooting victim, Sabrina Gilbert, is also referred to in the record as "Sabrina Gilbert-Elliott." We refer to her as "Sabrina."

learned the incident happened in Scioto County, but he continued to assist with the call. Chandler also learned a female victim was being transported in a silver car near U.S. 32 and S.R. 104, which was the direction Chandler was traveling. Chandler testified a silver car traveling the opposite direction swerved into his lane, he assumed to grab his attention.

{¶5} The car drove into a church parking lot, and the occupants flagged him down. Three males standing outside of the car were "frantic." The female in the backseat, Sabrina, appeared to have a gunshot wound to her upper right torso. She was calm, possibly in pain or shock. Chandler transported Sabrina to Adena Medical Center in his cruiser. Devyn Underwood rode in the backseat with his mother. Underwood and the younger son Dylan followed in their vehicle. Once there, Sabrina was immediately taken for treatment. Underwood and his son Dylan had not yet arrived when Chandler went out to the waiting room. Chandler testified that Underwood arrived at the hospital in a different vehicle than the silver Honda he was driving when he flagged Chandler down.

{¶6} Chandler gathered information. Sabrina stated that Elliott had shot her accidentally. Underwood told Chandler that they were planning to take Dylan to school when Elliott came out of his house, upset because his tires had been slashed, and brandishing a firearm. Sabrina and Elliot were arguing while Elliott waved a gun. Underwood first went inside the camper, thinking Sabrina could calm Elliott. According to the story Underwood told Chandler, Underwood heard the two continuing to argue, so he went back outside and further witnessed Elliott waving the gun. At that point, Underwood snuck behind Elliott and tackled him, causing

the gun to discharge. Chandler testified that Underwood told him he beat Elliott so that he could take the gun from him. Underwood even admitted attempting to shoot Elliot, but the gun jammed when he pulled the trigger.

{¶7}    Chandler asked Underwood where the firearm was and whether Underwood still had it on him or if it was in the car.  Underwood told Chandler he had turned the bullet backwards inside the firearm and stored it at his mother's house in Waverly for safekeeping.  Chandler and Detective Jodi Conkel later retrieved the gun with Underwood's assistance.  On cross-examination, Chandler reiterated that Underwood was cooperative and described him as "excited and upset."

{¶8}    Deputy Darren Fike testified that he travelled to 124 Wallace Road where he found Elliott, unable to speak and covered in blood, being loaded onto a cot. Deputy Fike took photographs of Elliott's injuries and the surrounding area.

{¶9}    Detective Sergeant Jodi Conkel of the Scioto County Sheriff's Office testified that she and Detective Spencer were on their way to Wallace Road when they were diverted to Pike County Hospital on report of a female with a gunshot wound at the hospital.[3]  When they arrived, Sabrina was being treated.  Underwood and his two sons and Corporal Chandler from Pike County were also there.

{¶10} Detective Conkel testified Underwood volunteered that he had once possessed the firearm involved in the shooting but had taken it to a Waverly location. They travelled to the location and Underwood led her to the gun in a closet. Conkel photographed the weapon and secured it in her vehicle. Conkel

---

[3] Detective Spencer became ill at trial. His testimony was brief. He assisted Detective Conkel and he interviewed Devyn and Dylan Underwood.

identified the weapon as a Cobra 380 with a magazine which she secured in a box. A bullet was still inside the gun barrel. Conkel testified the gun barrel was impacted with mud, dirt, and rocks. Detective Spencer had used a knife to retrieve the bullet from the barrel. Conkel further testified there was also a magazine with a bullet inside.  The bullet had been inserted backwards in the magazine. Conkel interviewed Underwood in a voluntary videotaped statement at the Scioto County Sheriff's Office, which was played for the jury.

{¶11} Conkel contacted Shane Hanshaw, a special agent with the Ohio Bureau of Criminal Investigations, to process the crime scene. He arrived at approximately 10:00 a.m. the day of the incident. EMS were there and officers had barricaded the scene. Hanshaw took photographs of the entire scene and testified there was a large concentration of blood on the ground, saturated in the soil, about five feet from the house. There were also random areas of blood drip stains and a stick with suspected blood lying next to the house. He recovered a cell phone and a 380-cartridge case at the corner of the front porch. Hanshaw took pictures of the evidence collected and turned it over to the Scioto County Sheriff's Office.

{¶12} Terry Crothers, an EMT and firefighter with Rarden Township, responded to the scene to assist Elliott. Elliott's eyes were swollen shut and bruised, blood was coming out of one of his ears, and bruising was noted on the back of his head. Elliott needed air transport due to possible head injuries. Crothers testified that blood was coming out of Elliott's mouth. Elliott was able to give brief responses about his name and about the altercation.

{¶13} Ryan Hagler, a flight paramedic with Air Evac, also noticed trauma to Elliott's head. Hagler determined that Elliott was critical with possible massive head trauma. Hagler also noticed Elliott could give short responses and he considered Elliott "fairly stable." Elliott was flown to Cabell Huntington Hospital.

{¶14} Dr. Andrew Young, an emergency room doctor at Cabell Huntington Hospital testified about Elliott's medical records. Dr. Young described Elliott's head as "pretty swollen," which indicated to him that Elliott had sustained multiple hits and likely had broken bones. He was able to move his extremities. According to the history reviewed, Elliott was awake with a severe headache, significant swelling to the left face, center area around the ear, and blood in the ear. The neurological examination revealed Elliott was awake, alert, and moving his extremities.

{¶15} Dr. Young testified that the CT reports indicated Elliott had sustained a traumatic left subdural hematoma. Dr. Young explained a subdural is a broken vein, a potentially life-threatening condition.[4] The hematoma was indicative of blunt force trauma. Elliott also had a left zygomatic arch fracture, the bone outside of the eyeball, indicating a strong hit. Elliott was admitted to the intensive care unit (ICU) and a neurosurgeon performed a craniotomy the next day. The surgery was for the purpose of removing the blood from the hematoma and to prevent continued bleeding.

{¶16} Dr. Errington Thompson, attending surgeon at Cabell Huntington Hospital, testified he provided input as to whether Elliott was ready for the surgery.

---

[4] Dr, Young explained the hematoma puts pressure on the brain and pushes the brain against the spinal cord, which controls breathing and heart rate. Blood pooling in the brain causes it to shift.

Elliott was observed for several hours. CT scans on February 3 and February 4, 2020 both showed a subdural hematoma. Dr. Thompson read the impression for the CT scan done February 3, 2020: "Large frontal temporal subdural hematoma causing mass affect left to right midline shift as described above." The repeat CT scan looked worse. Dr. Thompson testified the hematoma was abnormally large, measuring 2.3 centimeters in thickness. Dr. Thompson testified a hematoma of that size can cause respiratory failure, decrease in mental status, and death if surgery is not performed quickly. An extensive craniotomy was needed to remove the blood between his brain and skull and to relieve the pressure on his brain.

{¶17} Dr. Thompson also testified that Elliott's Cabell records indicated facial and nasal bone fractures – a fracture of the left zygomatic arch, fracture of the left inferior orbital, and fracture of the lateral wall of the left orbit. Dr. Thompson explained the zygomatic arch is the narrow bone on the side of your face, and the inferior orbital is underneath the eyeball socket. Based on the medical documentation, Dr. Thompson suspected Elliott had incurred extensive blunt force trauma.

{¶18} Dr. David Provaznik, a family physician and medical director at Edgewood Manor, a skilled nursing home, also testified about Elliott's medical condition. Elliott was discharged from the hospital to Edgewood Manor on March 24, 2020, and Dr. Provaznik saw him the next day. Elliott was unable to speak and comprehend. He had visible scars from a tracheostomy, and he had a feeding tube.

**{¶19}** Dr. Provaznik testified the goal for Elliott was to return him to activities of daily living so he could eventually return home. Dr. Provaznik next saw Elliott approximately three weeks later on April 15, 2020. Wayne Elliott, a family member decided Elliott needed discharged to home. Dr. Provaznik testified Elliott was cognitively confused, unaware of his surroundings, and needed assistance. He was still using a feeding tube. Dr. Provaznik determined that the discharge must be "against medical advice." Dr. Provaznik discussed the reasons for the discharge against medical advice:  Elliott's previous injuries were serious; he had a lengthy hospitalization after the craniotomy which included surgeries for the tracheostomy and insertion of the feeding tube; he had not met many of his goals; and, he still required assistance. Dr. Provaznik testified there were too many "unknowns." Dr. Provaznik had concerns such as the type of environment Elliott was going to; who would follow up with Elliott; would he have necessary medical equipment; was physical therapy part of the plan; and whether the family would be able to handle the feeding tube.

**{¶20}** Dr. Catherine Farinet testified that since 2017 she had been Elliott's primary care physician through Adena Healthcare System. She treated him every three months for diabetes, blood pressure, cholesterol, chronic pain, and anxiety and refills on his medications.  At the time Dr. Farinet began treating him, Elliott had been on narcotic pain medication after a fall off a ladder 20 years earlier. She opined that continued pain medication was warranted. She also prescribed Benzodiazepine, a sedative, for anxiety. As a required precaution, Elliott signed a pain management agreement.

{¶21} Dr. Farinet testified that Elliott's family contacted her on April 16, 2020, and she went to see him that same evening. She then learned that Elliott had a traumatic brain injury, surgery, and his recovery had been difficult. She was advised Elliott was not happy at the nursing home and wished to be home with his family. Also, Elliott was not receiving his pain and anxiety medications at the nursing home. Dr. Farinet opined that he really needed them. Dr. Farinet explained that the head trauma would have involved his neck, which would have served to increase his anxiety. Dr. Farinet testified she discussed with the family that he would need 24/7 care at home. The family advised her that a neighbor, a retired nurse, was going to help. Dr. Farinet believed the family would be able to administer nutrition through the feeding tube. She made sure Elliott had all the medical equipment needed.

{¶22} Dr. Farinet also opined that at that time, Elliott had a very poor prognosis. He was physically debilitated, and it was obvious he would succumb to his injuries. In her opinion, he needed hospice care because he had a condition and a life expectancy of less than six months. She did not expect him to live much longer. Dr. Farinet believed he would probably get better care at home because family would help him and would have love and emotional support.

{¶23} Dr. Dirk Juschka, Medical Director for Portsmouth Heartland Hospice, testified that upon review of a hospice nurse's evaluation, he learned Elliott had a traumatic brain injury and a huge decline in his level of function. He was bedridden, had difficulty swallowing, had communication problems, and needed tube-feeding. Dr. Juschka opined Elliott would live six months or less and

would probably die by aspiration pneumonia. Based on those facts, Elliott was admitted to Heartland Hospice care. According to the Heartland Hospice records, Elliott first received hospice care on April 17, 2020. He had 12 hospice visits from a nurse and died on April 29, 2020.

{¶24} On April 30, 2020, Dr. Russell Uptegrove, forensic pathologist with the Montgomery County Coroner's Office, performed an autopsy. Dr. Uptegrove identified photographic exhibits that showed wounds to Elliott's head, face, and neck. Dr. Uptegrove prepared an autopsy report and attached a toxicology report. He opined to a reasonable degree of medical certainty that Elliott's cause of death was complications of blunt force injury to the head. Specifically, he testified:

> [A]t the time of his death,* * * he * * * had sustained a pretty significant head injury, and * * * during his post-recovery course there had been some episode of aspiration pneumonia, which at autopsy I'm seeing the effects of the pneumonia in his lungs. So, I felt like this traumatic event did make a contribution to his ultimate demise.

Dr. Uptegrove further testified there were no independent intervening causes of death after the traumatic brain injury.

{¶25} At the time of trial, Sabrina was 38 years old. On cross-examination, Sabrina testified that she had known Elliott for 15 years, since she was 22 years old and he was 53 years old. She and Dustin Underwood had lived next to Elliott in an apartment complex. Sometimes she used Elliott's phone and he helped her financially. She later moved away but continued to see Elliott several times a week. Sabrina admitted having a prior drug problem, using Xanax and opiates. She testified Elliott was prescribed Xanax and Oxycodone, but he did not take them unless he was going to the doctor. Sabrina married Elliott in May of 2018 but did

not consider the relationship romantic. She lived in the camper behind Elliott's house. She did not take his last name. By 2020, with Elliott's approval, her sons, Devyn and Dylan, came to live with her.

**{¶26}** Prior to the February 3, 2020 incident, Sabrina had just returned from a four-month stay in drug rehabilitation. She had been living in the camper about two weeks. While she was in rehab, her sons stayed in the camper and Elliott looked after them. Dustin Underwood, the boys' father, came to visit them and she could see it bothered Elliott that Underwood was there. The relationship between the men was not good. Sabrina testified that Elliott was afraid she would leave him for Underwood.

**{¶27}** Sabrina had difficulty remembering the events related to her shooting and Elliot's assault. She was hospitalized three weeks and after her discharge, she wrote a statement about the shooting. She identified her written statement but testified that she could not remember if she actually *saw* and *remembered* the events in her statement or if she *had been told* about the events later. According to Sabrina's recollection, prior to the shooting, Underwood was trying to help fix the camper. Underwood had stayed the previous two nights. Sabrina could not recall what Elliott said a few days before the shooting, but it got Underwood and Devyn "stirred up." The day before Sabrina was shot, Underwood and the two boys were working on Sabrina's car in the driveway. Elliott was on his porch. The two men yelled at each other. Underwood had to get into Elliott's garage to use his tools and Elliott didn't like it. Dylan told her he saw Elliott with a gun. On that occasion, Sabrina told Elliott not to bring the gun out, so Elliott put it away and

stayed in the house. That same night, Underwood stayed all night in the camper. Sabrina testified Elliott thought Underwood stayed with her, but "it wasn't like that."

{¶28} In the morning of February 3, 2020, they all went to Waverly. When they returned, Elliott opened his door. Sabrina went straight to the camper to change her clothes and she heard yelling. She looked out and saw Elliott at the end of his porch. The boys came in and told her that Elliott was on his porch yelling and waving a gun, angry about his flat tires and about Underwood still being there. Elliott had previously threatened to harm Underwood, so Sabrina was concerned and upset. Sabrina went to Elliott's porch to confront him. However, by the time she got to Elliott's house he had gone back inside. Nevertheless, Sabrina knocked on the door. When Elliott opened the door and came outside, she yelled at him and asked him why he was waving the gun at the kids. Sabrina testified they were standing close when someone shoved her. Sabrina was shot and she fell backwards. Sabrina remembered lying on the ground, apparently in and out of consciousness. Shortly thereafter, Underwood picked her up and carried her to the car.

{¶29} On redirect Sabrina admitted that she did not call 9-1-1 to report Elliott but instead confronted him. She admitted that although Elliott had gone back into his house, she knocked on the door to summon him. Much of the testimony about Sabrina and Elliott's relationship, and her drug issues, was elicited on cross-examination. While the trial court sustained objections to some of the testimony, it appeared that the defense strategy was to insinuate that Underwood disliked Elliott because of his alleged contribution to her drug problem and that the beating was

a result of a sudden fit of rage brought on by the nature of Sabrina and Elliott's relationship and with Elliott's brandishing a gun in her direction.

{¶30} Devyn Underwood's testimony began by describing his plea agreement with the State of Ohio for his participation in Elliott's assault.[5] Devyn confirmed that prior to the events of February 3, 2020, Devyn and his brother Dylan and their mother were staying in a camper behind Elliott's house. Devyn testified Elliott's house was open to him and his mother and brother. They went to Elliott's house to play cards, do laundry, shower, or eat pizza.

{¶31} On February 3, 2020, Devyn's father Dustin Underwood was also on Elliott's property. Underwood had been visiting three days and had stayed at night in the camper. Devyn testified his dad asked Elliott for permission to visit or stay. Devyn testified the night before the shooting, he punctured the tires on Elliott's car.[6] After damaging the tires, Devyn went back to the camper and played video games with his brother. Devyn identified a photograph of Elliott's house and the camper behind it.

{¶32} The next morning around 8:00 a.m., Elliott was on his porch with a gun pointed at Devyn's family. Sabrina stepped in front of the camper door, while the rest of them were behind her in the camper door and yelled at Elliott: "Don't be pointing that gun at our kids." Sabrina started in the direction of the house and Devyn and his dad followed her. When they got closer, Underwood went around

---

[5] Devyn pled to felonious assault, a second-degree felony. He understood that in exchange for his truthful testimony, he would be allowed a judicial release after 18 months and 3 years probation.
[6] Devyn was reluctant to testify as to his motive for slashing Elliot's tires and he slashed them knowing his mother also had use of the car.

the side of the house. Devyn testified Sabrina and Elliott were angrily exchanging words when his dad went behind Elliott.  Devyn testified:

> I seen dad coming around- - came- - came behind Lonnie and put- -put his hands behind Lonnie [Elliott] and strapped him - - strapped him up.  So, at this point his- - [Elliott's]  hands was up in the air and he started to tumble forward and once that happened I hit him in the nose, and he started fumbling backward - - going back or falling.  At that point between him falling and him hitting the ground he ended up shooting the gun.

{¶33} On cross-examination, Devyn clarified that the firearm was not discharged until *after* the struggle between his father and Elliott, initiated from behind by his father, Devyn testified as follows:

> Q:     Okay. But you decide you're going to punch Gabe [Elliott] right in the face?
>
> A:     Yeah.
>
> Q:     And that knocks him backwards and knocks your dad backwards?
>
> A:     Yeah.
>
> Q:     And then it sounds like they fall off the porch?
>
>         * * *
>
> Q:     Fall on the porch?
>
> A:     Yes.
>
> Q:     And somewhere in this few seconds the gun goes off?
>
> A:     Yes.
>
>         * * *

Devyn further clarified that he struck Elliott before the gun discharged.

Q:    Do you know whether you hit Gabe [Elliott] in the nose
       before or after he fired his pistol?

A:    Before.

Q:    You hit him in the nose before?

A:    Before, yes sir.

**{¶34}** Underwood did not testify at trial. His explanation of the facts leading to Sabrina's shooting and the attack on Elliott are set forth in his videotaped statement and the written statement he provided to Detective Conkel, which we discuss in our analysis of his assignments of error.

**{¶35}** The jury found Underwood not guilty of murder or felonious assault, but guilty of voluntary manslaughter and aggravated assault, a lesser offense in violation of R.C. 2903.12. The trial court merged the voluntary manslaughter and aggravated assault counts for purposes of sentencing. The State elected to sentence on voluntary manslaughter. The trial court ordered a minimum prison term of 10 years to an indefinite maximum prison term of up to 15 years and a mandatory 3-year-term for the firearm specification, to run consecutively. Underwood appealed.

## II.    ASSIGNMENTS OF ERROR

I.     THE TRIAL COURT ERRED WHEN IT IMPROPERLY
        INSTRUCTED THE JURY.

II.    APPELLANT'S CONVICTIONS ARE NOT SUPPORTED BY
        THE EVIDENCE.

III.   APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE IN
        HIS REPRESENTATION OF THE APPELLANT.

IV.    APPELLANT'S SENTENCE IS CONTRARY TO LAW.

V.    THE CUMULATIVE EFFECT OF THESE ERRORS DEPRIVED APPELLANT OF A FAIR TRIAL.

III.  LEGAL ANAYSIS

A. Jury Instructions

**{¶36}** In his first assignment of error, Underwood contends that the trial court erred when it: (1) refused to give an instruction on self-defense; (2) erroneously instructed the jury on the inferior offenses; (3) instructed the jury on complicity; and (4) instructed the jury on the firearm specification.

1. Standard of Review

**{¶37}** A trial court has a duty to provide the jury with full and complete instructions and we review a trial court's refusal to give a requested jury instruction under an abuse of discretion standard:

> A trial court generally has broad discretion in deciding how to fashion jury instructions. However, "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." "Additionally, a trial court may not omit a requested instruction, if such instruction is 'a correct, pertinent statement of the law and [is] appropriate to the facts * * *.' " "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." (Citations omitted.)

*State v. Kelly*, 4th Dist. Hocking No. 20CA5, 2021-Ohio-2007, ¶ 13. " 'An abuse of discretion connotes more than a mere error of judgment; it implies that the court's attitude is arbitrary, unreasonable, or unconscionable.' " *Kelly* at ¶ 14, quoting *State v. Ables,* 4th Dist. Pickaway No. 11CA22, 2012-Ohio-3377, ¶ 9, citing *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

## 2. Jury Instruction on Self-Defense and Defense of Others

{¶38} In this case, the trial court declined Underwood's request to instruct the jury on self-defense and defense of others. Underwood contends this is error because the evidence shows that he acted in self-defense and defense of others when Elliott came onto the porch with a loaded gun and "put it near Ms. Gilbert while arguing." Underwood asserts that there was sufficient evidence to support the requested instruction and the trial court erred by failing to do so.

{¶39} R.C. 2901.05(B)(1) states:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

This statute, as amended in 2019, shifts the burden of proof on the affirmative defense of self-defense from the defendant to the prosecution, provided that "there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence." *Id.; See State v. Tolle,* 4th Dist. Adams No. 19CA1095, 2020-Ohio-935, ¶ 18.

{¶40} " 'In determining whether to give a requested jury instruction, a trial court may inquire into the sufficiency of the evidence to support the requested instruction.' " *Tolle* at ¶ 20, quoting *Hamilton* at ¶ 70 (internal quotes omitted). A trial court is therefore vested with discretion "to determine whether the evidence is sufficient to require a jury instruction." *State v. Mitts,* 81 Ohio St.3d 223, 228, 690

N.E.2d 522 (1998); *see also State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989), paragraph two of the syllabus. "When determining whether evidence is sufficient, a trial court must consider only the adequacy of the evidence presented—not its persuasiveness * * *. The question is not whether the evidence should be believed but whether the evidence, *if believed*, could convince a trier of fact, beyond a reasonable doubt, that the defendant was acting in self-defense." (Citations omitted.) *State v. Palmer*, __ Ohio St.3d__, 2024-Ohio-539, __N.E.3d __, ¶ 21. "Evidence is sufficient where a reasonable doubt of guilt has arisen based upon a claim of self-defense." *State v. Melchior,* 56 Ohio St.2d 15, 20, 381 N.E.2d 195 (1978). "If the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *Id.* Thus, "[a]s a matter of law the trial court cannot give a jury instruction on an affirmative defense if a defendant fails to meet this burden." *State v. Schwendeman*, 4th Dist. Athens No. 17CA7, 2018-Ohio-240, 104 N.E.3d 44, ¶ 19.

{¶41} " 'To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *Tolle* at ¶ 25, quoting *State v. Barnes,* 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002), citing *State v. Robbins,* 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. "Furthermore, the

degree of force used by a defendant must be 'warranted under the circumstances' and 'proportionate to the perceived threat.' " *State v. Bundy*, 2012-Ohio-3934, 974 N.E.2d 139, ¶ 55 (4th Dist.), quoting *State v. Palmer,* 80 Ohio St.3d 543, 564, 687 N.E.2d 685 (1997). *See State v. Paskins*, 2022-Ohio-4024, 200 N.E.3d 684, ¶ 50 (5th Dist.).

**{¶42}** The trial court also declined to give a requested jury instruction on defense of others. Underwood argues that Sabrina did not start the affray when she simply knocked on Elliott's door, unarmed, to "talk" to him about having a gun and waving it around near her children. In Underwood's view, Elliott was the aggressor who escalated the situation.

**{¶43}** " 'Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault. However, "one who intervenes to help a stranger stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault." * * * Therefore, one who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense.' " *State v. Dixon*, 4th Dist. Hocking No. 21CA8, 2022-Ohio-2807, ¶ 35, quoting *State v. Belcher,* 2nd Dist. Montgomery No. 24968, 2013-Ohio-1234, ¶ 35, quoting *State v. Moss*, 10th Dist. Franklin No. 05AP-610, 2006-Ohio-1647, ¶ 13; *State v. Wenger*, 58 Ohio St.2d 336, 340, 390 N.E.2d 801 (1979). For Underwood to act in defense of Sabrina, the evidence must show: (1) that Sabrina was not at fault in creating the violent situation, (2) that Sabrina had a bona fide belief that she was in imminent

danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that Sabrina did not violate any duty to retreat or avoid the danger. *See State v. Blevins,* 2019-Ohio-2744, 140 N.E.3d 27, ¶ 75 (4th Dist.).

**{¶44}** In this case, there are only three living fact witnesses to the events which transpired at Elliott's home on February 3, 2020: Underwood, Sabrina, and their son Devyn. Based on our review of the testimony of Sabrina and Devyn, along with Underwood's written and videotaped statements, we do not find the trial court erred either by declining the request to give a self-defense instruction or by declining the request to give a defense of others instruction. Underwood has failed to establish that Sabrina and he were not at fault in creating the situation giving rise to the affray, that either of them had a bona fide belief that he or she was in imminent danger of death or great bodily harm, or that the duty to retreat or avoid the danger was not violated by them.

**{¶45}** Sabrina's testimony was clear. While she admitted that, because of her injuries, she could not remember what she observed, Sabrina specifically testified that after her sons told her that Elliott was upset about his tires and about Underwood being there, she decided to confront him. Sabrina testified that by the time she had gotten to Elliott's porch, he had gone back inside the house. Moreover, she testified she had to knock on his door to get him to come outside.

**{¶46}** In Underwood's recorded statement, he told Detective Conkel that he saw Sabrina walking up to Elliott's house after Dylan told her Elliott had been waving a gun at them. According to Underwood, he told her to "leave it alone," but

she persisted. Underwood next saw Sabrina and Elliott yelling at each other.

Underwood described the incident in his recorded statement as follows:

> [S]o I hurried up and I ran around the back side of the house, and like I could try to grab the gun from him from the back side, you know, before somebody got hurt. And then it was like when I was going on the porch I seen her going towards him, and I seen his hands come up, and then I tried to go to the back of him to- -to brace, you know, to brace his arms where he didn't * * * [f]ire his gun off. And then it was probably my feet that had tied us up cause I went- - I was almost running at him and we started to fall towards the ground.

Underwood's written statement describes the following:

> [S]o we went to eat pizza then come back worked on some cars then went to the camper and herd [sic.] screaming so I looked and it was Gabe [Elliott] saying he wants me off the property for nothing he was gonna call the law and started pointing the gun towards all of us so I told him to shoot he pulled it but he turned and walked away then one of the boys told his mom and she walked up to Lonnie's [Elliott's] house and I herd [sic.] fighting and seen him put a gun up to her and said no about giving her the gun so I ran around and we started scuffling and I herd [sic.] Sabrina give it to me I went to grab his arm he pulled away and pointed it at her I didn't hear the gun go off but Sabrina said she got shot so me and my boys took him to the ground and beat him up * * *.

**{¶47}** Devyn's testimony regarding the incident also sheds light on how his

mother's shooting, and later Elliott's beating, transpired. Devyn testified:

> [S]he went - - she started to go up there, and me and dad followed her, and dad went around the house to the right side and I followed mom. And at that point mom and Lonnie [Elliott] exchanged- - was exchanging words and I seen dad coming around- - came - - came behind Lonnie [Elliott] and put - - put his hands behind Lonnie and strapped him- - strapped him up. So at this point his- - his hands was up in the air, and he started to tumble forward and once that happened I hit him in the nose, and he started fumbling backward- - going back or falling. At that point between him falling and him hit the ground he end up shooting the gun.
>
> Prosecutor: So your dad * * * he went behind Lonnie [Elliott] with those arms, extended his arms

A:      Up.

Q.      Up and pushed Lonnie's [Elliott's] arms

A.      Up.

Q.      Up.

A.      Yeah.

Q:      And then what happened next? * * *

A.      I ended up hitting Lonnie [Elliott]. Then Lonnie [Elliott] and dad ended up tussling back, falling back, and falling down to the ground.

Q.      Okay. So, as your dad is doing this to Lonnie [Elliott], you punch Lonnie [Elliott]?

A.      Yes, sir.

Q.      Okay. Where'd you punch Lonnie [Elliott] at?

A.      In the nose.

                         * * *

Q:      All right. And that knocks him back, I think you said, him and your dad, right?

A:      Yes.

Q:      And when does the gun go off in that sequence or is there more that happens before it goes off?

A:      Either when he was tumbling back, or when he's falling to the ground, or when he was on the ground.

                         * * *

Q:      So the gun went off at some point when he's either falling back, or he's stumbling to the ground, or when he hits the ground? Is that a fair statement?

A:          Yes, sir.

                        * * *

Q:          But he's on the ground at some point and
            where's the gun at that point?

A:          My dad has it.

Q:          Your dad has it?

A:          He picked it up from the ground * * * He picked
            it up and he aimed it at [Elliott's] head.  He tried
            to pull the trigger but the gun jammed.

Q:          Okay.  Then what happened to Lonnie [Elliott]
            after that?

A:          He was just laying there.

Q:          When was he punched multiple times?

A:          When he was on the ground.

                        * * *

Q:          Would you agree that Lonnie [Elliott] was
            punched a bunch of times?

A:          I'd say.

                        * * *

Q:          How many times do you think Lonnie [Elliott]
            was punched?

A:          Seven-eight times.

                        * * *

Q:          How many times did you punch him?

A:          Four.

                        * * *

Q:           Okay, so is it your testimony that your dad stopped punching him, got the gun, and put it to Lonnie's [Elliott's] head. Is that your testimony?

A:           Yes, sir.

* * *

Q:           So at that point the gun is away from Lonnie [Elliott]?

A:           Yes, sir.

**{¶48}** After hearing the above evidence, the trial court reasoned as follows:

In reviewing the evidence in the case * * * [a]nd there were some discrepancies * * * even if I accept the most beneficial version of the Defendant's statement, Lonnie Elliott came out of the house the morning of these events, he was angry because his tires had been slashed, got a gun, waved it around, * * * and then went back in his house. The evidence * * * is Sabrina Gilbert-Elliott was not happy * * * and went to the house to confront him * * *. Not only did she do that, but the Defendant also knew that she was doing that, because him and their oldest child followed behind her on the way to that residence. * * * There was evidence that the victim came back out of the house and continued this verbal dispute with Sabrina Gilbert-Elliott, and then the Defendant, * * * I * * * guess the word that came to mind for me, ambushed him from behind. The evidence was uncontroverted that the gun was not fired until after the Defendant grabbed Lonnie Elliott, * * *. I'm going to find that the Defense has not shown what they need to show that the - - Sabrina Gilbert-Elliott was not at fault at creating this situation.

**{¶49}** We agree with the trial court's conclusion. The evidence shows that although Elliott had been upset, yelling, and waving a gun on his front porch, he went back inside his house. Elliott's angry behavior had ceased yet Sabrina chose to go to his house and knock on his door, reviving the dispute. But for Sabrina's actions, Elliott would not have been on the front porch again.

**{¶50}** Underwood followed Sabrina to Elliott's house likely knowing that she was going to confront Elliott in some manner because in his recorded

statement he recalled telling her to "leave it alone." Sabrina testified that she had talked Elliott into putting a gun away on one prior occasion but instead of leaving it to her to handle the situation, Underwood followed her. The evidence, specifically provided by Sabrina herself, shows that she was clearly at fault for creating the violent situation. Sabrina's testimony, though limited on other facts, was clear that Elliott had gone inside the house after waving the gun at the others. She had to knock on the door to get him to come out.[7]

{¶51} Through Underwood's recorded statement, we learn that Sabrina appeared aggressive towards Elliott because Underwood stated, "I seen her go towards him." Sabrina's aggressive actions show she started the chain of events which led to the struggle between the two men. Both Underwood's statements, written and recorded, indicate that he let her go by herself to the porch and then heard yelling and arguing and then intervened. However, Devyn's testimony was that "She started to go up there, and me and dad followed her." The distinction is key to the sufficiency of the evidence. Underwood was not simply intervening after a dangerous situation had occurred. By following her, Underwood was taking part in the situation giving rise to the resulting affray which ended up in Sabrina's accidental shooting. Furthermore, Devyn described his father's actions of coming up behind Elliott and pushing his arms into the air. By doing so, Underwood escalated the affray from a verbal altercation between Elliott and Sabrina to a physical struggle between the two men when Underwood "ambushed" Elliott from behind. And while Underwood told Corporal Chandler that he beat Elliott to get the

---

[7] None of the witnesses testified as to who began yelling or arguing first.

gun away from him, this contradicts Devyn's testimony that after Underwood pushed the older man's arms upward and the two men fell to the ground, that the gun was retrieved from the ground. We agree that Sabrina was at fault for creating the situation and Underwood was at fault for escalating it. Thus, the first element for establishing self-defense to warrant a jury instruction on the defense is not met.

{¶52} Second, Sabrina's actions also show she had no bona fide belief that she was in imminent danger of death or great bodily harm. Any individual with actual fear would not reasonably go unarmed to an armed person's home, cause them to open the door, yell at them, and then attempt to grab the weapon. Furthermore, the evidence does not demonstrate that Underwood had a bona fide belief that he was in imminent danger of death or great bodily harm either for himself or his family. This is shown by his written statement in which he told Elliott to go ahead and shoot, despite the fact Sabrina and the two boys were also present. Underwood also chose to follow Sabrina to the porch of an armed, but elderly, 68-year-old man. It is not reasonable to believe that either Sabrina or Underwood had a bona fide belief that they were in danger or they would not have proceeded to Elliott's front porch. Underwood's decision to go behind Elliott's house and, as the trial court stated in its ruling, "ambush" Elliott from behind, demonstrates that Underwood placed himself in a furtive and superior position to Elliott. Underwood would have no reason to fear an elderly person he was attacking from behind.

{¶53} Additionally, Sabrina and Underwood had a duty to retreat and neither of them attempted to retreat or avoid danger after Elliott returned to his

porch with a gun. While Sabrina and her sons had permission to come and go from Elliott's house, nothing shows that Underwood did. In fact, the evidence of the yelling between the two men on the previous evening indicates Underwood's presence was not generally welcome on Elliott's grounds. Devyn testified that his father had to ask permission of Elliott to visit or stay. Thus, Underwood had a duty to retreat and violated this duty. And even if Underwood arguably had no duty to retreat, once Elliott was incapacitated and defenseless on the ground, the gun having been dropped during the fray, the situation did not call for continued striking of Elliott's face and head by Underwood and his son. *See State v. Lane*, 6th Dist. Erie No. E-22-035, 2023-Ohio-1305, ¶ 27.

{¶54} Based on the foregoing evidence, we cannot find the trial court erred by failing to give jury instructions on self-defense. Nor has the criteria for giving a "defense of others" instruction been met. Underwood was not rightfully acting in Sabrina's or his own defense. Underwood's argument on these dual bases has no merit. Consequently, we find the trial court did not abuse its discretion in denying the defense's request for an instruction on self-defense and defense of others.

3. Jury Instruction on Inferior Offenses:  Aggravated Assault & Complicity

{¶55} Underwood was found guilty of the "lesser offense of aggravated assault." Although Underwood was found guilty of aggravated assault, he was not convicted of it.  The trial court merged count three, aggravated assault, with Underwood's conviction on count two, voluntary manslaughter, for purposes of sentencing. " 'For the purposes of R.C. 2941.25, the allied offense statute, a *conviction* consists of a guilty verdict and the imposition of a sentence or penalty.'

" (Emphasis added.) *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241, at ¶ 18, quoting *State v. Whitfield,* 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 12, citing *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 135.

{¶56} Because count three, aggravated assault, merged with the voluntary manslaughter conviction of count two, count three is not a conviction. Therefore, we need not review Underwood's claimed error in the aggravated assault instruction. *See, e.g. Franks*, *supra,* (court need not individually review the findings of guilt on the separate counts which merged into aggravated murder count); *State v. Williams,* 4th Dist. Scioto No. 11CA3408, 2012-Ohio-4693, ¶ 54 (where trial court did not impose sentence on conspiracy count merged with trafficking counts, there was no conviction and thus no conspiracy conviction to vacate); *State v. McKinney*, 10th Dist. Franklin No. 08AP-23, 2008-Ohio-6522, ¶ 39 (only reviewing the sufficiency of the evidence for the crime for which the sentence was imposed and not the counts merged into that crime).

{¶57} For his complicity argument, Underwood contends that the trial court erroneously instructed the jury to consider complicity during its deliberations. Defense counsel objected to the instruction, arguing that the instruction includes a specific intent of shared purpose and that no evidence of a shared plan was introduced at trial. For the reasons which follow, we reject Underwood's argument.

{¶58} This court recently discussed a complicity instruction in *State v. Foster*, 4th Dist. Scioto No. 21CA3967, 2023-Ohio-746, ¶ 31. We observed that Ohio's complicity statute provides, in relevant part, that "[n]o person, acting with

the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." "[T]o aid or abet is ' "[t]o assist or facilitate the commission of a crime, or to promote its accomplishment." ' " *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 27, quoting *State v. Johnson,* 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001), quoting Black's Law Dictionary 69 (7th Ed.1999).

{¶59}  " 'A conviction for complicity by aiding and abetting under R.C. 2923.03(A)(2) requires the State to prove, beyond a reasonable doubt, "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." ' " *Foster* at ¶ 32, quoting *State v. Whitehead,* 4th Dist. Scioto No. 20CA3931, 2022-Ohio-479, ¶ 81, quoting *Johnson* at syllabus. " 'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Id.* at 245, quoting *State v. Pruett,* 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). However, " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *State v. Widner,* 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.*

{¶60}  The trial court instructed as follows:

Before you can find the Defendant guilty of the principal offenses by reason of complicity, you must find beyond a reasonable doubt, that on or about the 3rd day of February 2020, in Scioto County, Ohio, the Defendant knowingly aided or abetted another in committing or -

- all or any of the offenses alleged in the indictment, or that the Defendant conspired with another to commit any or all of the offenses alleged in the indictment.  Aiding or abetted means supported, assisted, encouraged cooperated with, advised, or incited.
        * * * Complicity may be demonstrated by circumstantial, as well as direct evidence.  Participation in criminal intent can be inferred from the circumstances surrounding the offenses, including presence, companionship and conduct before and after the offense is committed.

{¶61} Underwood points to Devyn's testimony to argue an absence of evidence of planning or communication between father and son as required to support a complicity or conspiracy instruction.  Devyn testified as follows:

Q:    Okay. You say your mom started walking up towards
       Gabe [Elliott]?

A:    Yes.

Q:    Okay.  And you start following her?

A:    Yes.

Q:    Have you and your father talked about the situation
       with each other?  Had he said anything to you?  Have
       you said anything to him?

A:    No.

* * *

Q:    But your father doesn't stay beside you, does he?

A:    No.

Q:    He goes around the back of the cabin?

A:    Yes.

Q:    Do you know why he went around the back of the
       cabin?

A:    No.

Q:     Did he say why he was going around the back of the
       cabin?

A:     No.

* * *

Q:     Now, you remember your father coming up behind
       Gabe [Elliott], right?

A:     Yes.

Q:     But you didn't know what he was going to do?

A:     No. I didn't know what he was going to do.

**{¶62}** However, we are not persuaded that this testimony settles the question. We find no error in the trial court's provision of the complicity instruction. Devyn's testimony that there was no planning or communication between his father and him when they proceeded to Elliott's front porch is credible, given that the altercation appears to have arisen quickly on the morning of February 3, 2020. However, there is ample circumstantial evidence of a shared purpose or implicit agreement which quickly arose between father and son once they arrived at Elliott's porch. The father and son together engaged in conduct which facilitated the commission of the offenses of voluntary manslaughter and aggravated assault on Elliott when they both beat him savagely about the face and head.

**{¶63}** Underwood and Devyn followed Sabrina to Elliott's front porch. Devyn testified first Underwood forced Elliott's arms up in the air and the two began to struggle. Then Devyn punched Elliott in the nose. Underwood conceded in his recorded statement to Detective Conkel that together, both Devyn and he beat Elliott. In his written statement, he indicates both boys participated in the beating. We find that these actions, while probably not planned far in advance, nevertheless

constitute aiding, assisting, cooperating with, and encouraging for purposes of complicity.

{¶64} In *State v. Murray,* 11th Dist. Lake No. 2003-L-045, 2005-Ohio-1693, the appellate court noted that while all defense witnesses testified there was no plan to attack the victim, "actions of the group painted a different picture. The victim was attacked." *Id.* at ¶ 38. Here, as the trial court construed the testimony, Underwood "ambushed" Elliott from behind while Sabrina, with Devyn behind her, intentionally or unintentionally provided a distraction. Conceivably, Underwood may not have known that his son Devyn would throw a first punch. However, once Elliott was down on the ground and the firearm was away from him on the ground, both Underwood and his son repeatedly assaulted Elliott. *See, e.g.*, *State v. Stack,* 11th Dist. Lake No. 2014-L-172, 2015-Ohio-5521, ¶ 48 (Where victim testified Stack "corralled" him, making it impossible for him to escape from co-defendant, that Stack punched him, and weapon was found in Stack's truck, a jury could reasonably infer that Stack aided and abetted Campbell's felonious assault); *State v. Benson,* 2d. Dist. Montgomery No. CA. 16610, 1998 WL 425761 (June 19, 1998), *3 (Jury could reasonably infer that woman who arrived with Benson and sprayed victim with pepper gas was Benson's accomplice and Benson was also criminally liable for the physical harm that the other woman inflicted on victim); *State* v. *Black*, 2d Dist. Montgomery No. 18226, 2001 WL 256231 (March 16, 2001), *4-5 (Black made no effort to disassociate himself from the events that transpired and actively participated, thus jury could reasonably infer that Black possessed the culpable mental state required to aid and abet co-defendant).

**{¶65}** While Devyn may not have known what was going to transpire when he followed his parents to Elliott's porch, once there, father and son assisted and encouraged each other during the attack. Underwood never told Devyn not to strike Elliott the first time, or to stop striking him thereafter.[8] Underwood was the reason Elliott fell to the ground. Devyn threw the first punch. According to Devyn, they struck Elliott seven times. As in *Benson,* Underwood was also criminally liable for the physical harm that Devyn inflicted on Elliott. And as in *Black,* Underwood made no effort to disassociate himself from the beating his son began by throwing the first punch. A jury could reasonably infer, as this one did, that Underwood possessed the culpable mental state to aid and abet his son. Based on the foregoing, we find no error with the trial court's provision of jury instructions on complicity.

4. Jury Instruction of Firearm Specification

**{¶66}** In count two, voluntary manslaughter, Underwood was also convicted of a firearm specification. He argues that the trial court erred when it gave a firearm specification to the jury because there was no evidence that the gun was operable at the time he picked it up. The firearm which Elliott brought to the front porch when Sabrina Gilbert knocked on the door, was a Cobra 380. It is the gun that discharged, accidentally shooting Sabrina, when Underwood attacked

---

[8] During Underwood's videotaped statement, the officers inform Underwood that one of his sons does not want to talk to the officer. Underwood tells them to relay the message that his son can speak to the officers and to "tell the truth." While this may be admirable and indicative of Underwood's cooperation with law enforcement, this also demonstrates that both boys looked to Underwood as an authority figure and relied on Underwood for guidance. Seemingly, when Devyn and or Dylan were beating Underwood, he could have stopped the affray by simply commanding the boys to do so or by himself stopping.

Elliott from behind. When Underwood struggled with Elliott and brought him to the ground, the gun also fell to the ground and Underwood picked it up.

{¶67} According to Devyn's testimony above, Underwood retrieved the gun from the ground and pointed it at Elliott's head. However, it would not fire when he pulled the trigger. Underwood admitted he wanted to shoot Elliott.  According to Underwood's statement:

> He- - when he fell he must have dropped it.  Well, as soon as I seen it, I grabbed the gun, and I was gonna try to shoot him with it, and the gun had locked up. I could see the bullet sideways inside the chamber.

{¶68} The trial court instructed the jury to consider whether Underwood used a firearm during the commission of the other alleged crimes. Because defense counsel did not object, this asserted error is to be reviewed under the standard for plain error. Crim.R. 52(B) states:  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." " It is the defendant's burden to 'establish that an error occurred, it was obvious, and it affected his or her substantial rights.' " *State v. Shields,* 4th Dist. Washington No. 22CA11, 2023-Ohio-2331, ¶ 72, quoting *State v. Fannon,* 2018-Ohio-5242, 117 N.E.3d 10, ¶ 21.  "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."  *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶69} Imposition of a three-year mandatory prison term for a firearm specification is precluded unless the indictment or charging offense specifies, and the State establishes, that "the offender had a firearm on or about the offender's

person or under the offender's control while committing the offense and displayed

the firearm, brandished the firearm, indicated that the offender possessed the

firearm, or used it to facilitate the offense." R.C. 2941.145(A). The Revised Code

defines a "firearm" as follows:

> (B)(1) '"Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. "Firearm" includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.

> (2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.

R.C. 2923.11(B). *See State v. Elliott,* 2022-Ohio-3778, 199 N.E.3d 944, ¶ 51 (3d

Dist.).

**{¶70}** " '[T]he state must prove beyond a reasonable doubt that the firearm

was operable or could readily have been rendered operable at the time of the

offense.' " *State v. Allah,* 4th Dist. Gallia No. 14CA12, 2015-Ohio-5060, ¶ 10,

quoting *State v. Gaines*, 46 Ohio St.3d 65, 68–69, 545 N.E.2d 68 (1989).

Subsection (B)(2) of the statute expressly allows the trier of fact to rely upon

circumstantial evidence to determine if the firearm was operable. *State v.*

*Thompkins,* 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541 (1997), paragraph

one of the syllabus. Empirical analysis of the gun is not required to prove

operability. *State v. Murphy*, 49 Ohio St.3d 206, 209, 551 N.E.2d 932 (1990).

**{¶71}** Ohio courts have found circumstantial evidence of operability where

ammunition is discovered loaded into a gun or alongside a gun that is capable of

firing it. *See Elliott* at ¶ 66; *State v. Pope*, 1st Dist. Hamilton No. C-180587, 2019-Ohio-3599, ¶ 10; *Allah* at ¶ 13; *State v. Smith*, 4th Dist. Pickaway No. 19CA33, 2021-Ohio-2866, ¶ 58-62; *State v. Tillman,* 6th Dist. Fulton No. F-11-006, 2012-Ohio-5265, ¶ 15; *State v. Hunter,* 9th Dist. Medina No. 17CA0069-M, 2018-Ohio-4249, ¶ 8; *State v. Dickerson,* 11th Dist. Ashtabula No. 2013-A-0046, 2015-Ohio-938, ¶ 36.  In *Allah,* we concluded that the jury had the actual weapons and could logically infer from the loading of one gun and the provision of ammunition for the other that both were capable of firing that ammunition. Neither testimony of test-firing nor operability reports are required to prove operability.  We found there to be sufficient evidence of operability to sustain Allah's conviction for having a weapon under disability.  *Id.* at ¶ 13.

{¶72} Devyn's testimony and Underwood's statement demonstrate that when Underwood pointed Elliott's own gun at his head, a 380 Cobra, it contained ammunition but would not fire because, as Underwood explained in his statement, "I could see the bullet sideways inside the chamber."  Thus, although the gun would not fire with the bullet sideways, the question is whether there was sufficient evidence that the gun was capable of being readily made operable to warrant an instruction to the jury.

{¶73} Detective Conkel testified that when she took the firearm into evidence, it had a bullet inside the barrel of the gun. There was also a magazine with a bullet inside the magazine. The magazine had been inserted into the gun backward. Underwood had told Conkel that he had removed the magazine and reinserted it backward into the gun so that the bullet would not feed into the

chamber. In addition, Conkel testified that the area where the bullet would exit the gun was impacted with mud and rocks and that Detective Spencer was able to dislodge the bullet out of the gun barrel using a knife.

**{¶74}** In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime * * *." *State v. Taylor*, 2015-Ohio-4556, 46 N.E.3d 1074, ¶ 24 (5th Dist.).

> "The requirement that a gun be either operable or readily capable of being rendered operable is meant to distinguish irretrievably broken guns from guns that are either fully functioning or temporarily non-functioning." ***A jammed gun that is temporarily nonoperational is capable of being readily rendered operable because the jam can be cleared***. (Citations omitted, Emphasis added.)

*State v. Maynard*, 1st Dist. Hamilton No. C-230160, 2023-Ohio-4619, ¶ 33; see also *State v. Fluellen*, 88 Ohio App.3d 18, 24, 623 N.E.2d 98, 102 (4th Dist.1993) (where gun had "a half-inch dirt plug in the barrel" the gun was temporarily inoperable but was readily made operable by cleaning the dirt plug out of the barrel).

**{¶75}** Upon review of the record, we find that Underwood failed in his burden to establish that an error occurred, it was obvious, and that it affected his substantial rights. There was undisputed evidence that a gun had been used, it had been fired moments before Underwood grabbed it, and it had seriously injured a person. Although a bullet had jammed in the chamber, the jam was cleared with a knife. Therefore, there was sufficient evidence that the gun could readily be made

operable. We find the trial court did not commit plain error when it gave a jury instruction as to the firearm specification.  Underwood's argument is without merit.

{¶76}   We overrule Underwood's first assignment of error.

### B. Sufficiency and Manifest Weight of the Evidence

{¶77} For his second assignment of error, Underwood contends that the verdicts are against the manifest weight of the evidence and are not supported by sufficient evidence. He argues that he acted in self-defense and was not the cause of Elliott's death because his death was caused by Elliott's decision to leave the nursing facility and go home. Underwood also argues that he did not use a firearm in the commission of the offenses because the evidence showed that the gun was jammed.

### 1. Standard of Review

{¶78} "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Torres,* 2023-Ohio-1406, 213 N.E. 3d 287, ¶ 44 (4th Dist.); *State v. Bennington,* 2019-Ohio-4386, 148 N.E.3d 1, ¶ 11 (4th Dist.).

{¶79} An appellate court must construe the evidence in a "light most favorable to the prosecution." *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d

1068 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993); *Torres* at ¶ 45. Further, "[t]he court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard,* 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 22, citing *State v. Kirkland,* 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. Lodwick,* 2018-Ohio-3710, 118 N.E.3d 948, ¶ 9 (4th Dist.). Thus, "a reviewing court is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.' " *State v. Davis,* 4th Dist. Ross No. 12CA3336, 2013-Ohio-1504, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). Rather, a reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶80} In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119; *Torres* at ¶ 78. To satisfy this test, the State must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable

doubt. *See State v. Eskridge,* 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), syllabus; *State v. Harvey*, 4th Dist. Washington No. 21CA3, 2022-Ohio-2319, ¶ 24. Because a trier of fact sees and hears the witnesses, appellate courts court will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 61 (4th Dist.).

### 2. Self-Defense, Defense of Others, and Causation

**{¶81}** Because Underwood's arguments hereunder are interrelated, we consider them jointly. Underwood was convicted of voluntary manslaughter, as defined in R.C. 2903.03(A), which states that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." First, Underwood argues the jury's verdict is not supported by the evidence because any rational trier of fact could have found that he acted in self-defense and in the defense of Sabrina and his children on February 3, 2020. Underwood argues that Elliott started the affray by coming onto his porch with a loaded gun. For the same reasons as posited above, Underwood contends that the verdict is against the manifest weight of the evidence.

**{¶82}** As we discussed in our analysis of appellant's first assignment of error, we agree with the trial court's conclusion that the evidence adduced at trial was sufficient so as not to warrant a self-defense jury instruction. *See Tolle* at ¶ 20, citing *State v. Mitts,* 81 Ohio St. 3d 223, 228, 690 N.E.2d 522 (1998) (A trial court is vested with discretion "to determine whether the evidence is sufficient to

require a jury instruction"). Based upon our review of the testimony as discussed above, and but for Underwood's additional claim that the Elliott's death was not proximately caused by him, we could easily dispose of his argument that his conviction is not supported by sufficient evidence and also that his conviction is against the manifest weight of the evidence.

**{¶83}** There is no question that Underwood and his son Devyn repeatedly struck Elliott about the face and head on February 3, 2020. However, Elliott did not die until April 29, 2020. At trial, the State of Ohio argued that Elliott died of complications of the blunt force trauma because of the assault on February 3, 2020. Underwood contends that the evidence was insufficient to support a finding that he knowingly caused Elliott's death because multiple unforeseeable events occurred between February 3, 2020, and April 29, 2020, as revealed in the medical documentation. While the medical records demonstrate that Elliott had a lengthy hospitalization and complications, Underwood points to the records which indicate Elliott was slowly improving and left the nursing home against medical advice. At Underwood's trial, the court also gave detailed instructions on the element of "knowingly." The trial court instructed on causation as follows:

> Cause is an essential element of the offense. A cause is an act which, in a natural and continuous sequence, directly produces the death, and without which it would not have occurred. The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act. The Defendant is also responsible for the natural and foreseeable consequences, or results, that follow in the ordinary course of events from the act. There may be more than one cause of an event. However, if the Defendant's act was one cause, then the existence of other causes is not a defense.

**{¶84}** We discussed the element of causation in the context of independent intervening events in *State v. Johnson,* 4th Dist. Scioto No. 13CA3580, 2014-Ohio-4443. Johnson was found guilty of felonious assault of a corrections officer, Meier. Meier was transported for treatment where he was diagnosed with a head injury, headaches, and sprains. He required shoulder surgery. At trial, Meier testified he had not been back to work, could not sleep, and suffered debilitating headaches. On appeal, Johnson argued that although he did hit the officer in the face, the injuries to the shoulder and head were not from the punch but from the melee which ensued when other prison officers got involved. Johnson argued the evidence failed because he did not knowingly cause serious physical harm by throwing the first punch which Meier escalated in the attempt to subdue Johnson.

**{¶85}** " 'It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' " *Johnson* at ¶ 18, quoting *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 966, ¶ 143, quoting *State v. Johnson,* 56 Ohio St.3d 35, 39, 381 N.E.2d 637 (1978); *State v. Champlin*, 11th Dist. Ashtabula No. 2013-A-0021, 2014-Ohio-1345, ¶ 22; *State v. Mynes,* 4th Dist. Scioto No. 12CA3480, 2013-Ohio-4811, ¶ 17. "[T]he jury, unable to enter the mind of another, is required to consider common sense, causal probabilities in considering whether the defendant acted 'knowingly.' " *State v. Kelly*, 11th Dist. Portage No. 2010-P-0049, 2012-Ohio-523, ¶ 23. We noted it was unquestioned that Johnson set into motion the sequence of events by punching Meier in the head. "The jury could have reasonably inferred from those punches themselves that Johnson had caused serious physical harm to Meier

resulting in his closed head injury and recurring debilitating headaches." *Johnson*

at ¶ 19. We further found:

> More importantly, Johnson could have reasonably foreseen that his unprovoked inmate attack on a prison guard would result in the guard he assaulted and other guards following prison protocol by attempting to restrain him by taking him down to the ground. Meier's injuries were consequently reasonably foreseeable to Johnson and they would not have occurred if Johnson had not started the altercation by punching Meier.

*Id.* at ¶ 20.

> **{¶86}** We have previously provided a general discussion of causation:

> Courts generally treat the issue of legal causation in the criminal context similarly to that in tort cases because the situations are closely analogous. *See, generally*, LaFave Substantive Criminal Law (2003), 2nd Ed., Section 6.4(c). When dealing with claims of intervening causation, the proper analysis starts with a determination of whether the intervening act was a mere coincidence or alternatively, a response to the accused's prior conduct. Id at 6.4(f). An intervening cause is a coincidence when the defendant's act merely places the victim at a certain place at a certain time, thus subjecting the victim to the vagaries of the intervening cause. LaFave gives the example of "A" shoots at "B" but misses. "B" then varies from his intended route, is struck by lightning, and dies. Had "B" continued on his anticipated route, he would not have been injured. The lightning is a coincidence.

> An intervening act is a response to the prior acts of the defendant where it involves reaction to the condition created by the defendant. Again from LaFave, "A" shoots "B" who is standing near the edge of a cliff. "B" impulsively jumps off the cliff rather than being the target of a second shot. This impulse may fairly be characterized as a normal response.

> This distinction is important because the law will impose a less exacting standard of legal causation where the intervening cause is a response rather than a coincidence. A coincidence will break the chain of legal causation if it was unforeseeable. Thus, in the first example "A" is not criminally liable for "B's" death, notwithstanding he may be charged with an "attempt." However, for a response to break the chain, it must be both abnormal and unforeseeable. *Id.* The distinction is premised upon a notion of

fairness that finds less reason to hold a defendant liable for bad results where the defendant has merely caused the victim to "be at the wrong place at the wrong time." A defendant who has brought the intervening agency into play in response to the danger he has caused is subjected to a more stringent test if he is to break the chain of causation. Thus, in the second example, "A" will face potential criminal liability for "B's" death.

*State v. Smith,* 4th Dist. Ross No. 06CA2893, 2007-Ohio-1884, ¶ 24-26.

**{¶87}** Thus, in *Johnson*, we concluded:

Johnson could have reasonably foreseen that his unprovoked inmate attack on a prison guard would result in the guard he assaulted and other guards following prison protocol by attempting to restrain him by taking him down to the ground. Meier's injuries were consequently reasonably foreseeable to Johnson and they would not have occurred if Johnson had not started the altercation by punching Meier.

*Johnson* at ¶ 20.

**{¶88}** Therefore, we also concluded that there was sufficient evidence for a rational trier of fact to find that the essential elements of felonious assault had been proven beyond a reasonable doubt and that the weight of the evidence supported the jury's finding that Johnson was guilty of felonious assault.

**{¶89}** In this case, Dr. Young testified that Elliott sustained a traumatic left subdural hematoma. Based on the medical documentation, Dr. Thompson testified Elliott's injuries were due to extensive blunt force trauma and required extensive brain surgery. Dr. Thompson further opined that at age 68, Elliott would have more difficulty healing. He testified that Elliott's discharge from the hospital did not mean he was clear of future potential problems associated with the brain surgery. He opined that Elliott's aspiration pneumonia was proximately related to the injuries he sustained in the assault.

**{¶90}** By the time Elliott went to Edgewood Manor for care, he had had a lengthy hospital stay, brain surgery, a tracheostomy, and an insertion of a feeding tube. Dr. Provaznik testified when he first encountered Elliott he was unable to speak and comprehend. The last time he saw Elliott, the man was still cognitively confused and unaware of his surroundings. Dr. Provaznik determined discharge to home must be against medical advice.

**{¶91}** Upon performing the autopsy, Dr. Uptegrove opined to a reasonable degree of medical certainty that Elliott's cause of death was complications of the blunt force injury to the head. He knew that Elliott had aspiration pneumonia during his recovery. During the autopsy, he observed the effects of the pneumonia in Elliott's lungs. Importantly, Dr. Uptegrove testified there were no independent intervening causes of death after the traumatic brain injury.

**{¶92}** Dr. Farinet testified that when she saw him on April 16th that his speech was garbled but he said that he "didn't want to be there and he wanted to go home." When she saw him, her opinion was that he would succumb to his injuries within six months and needed hospice care. Because of his traumatic brain injury, he would be battling aspiration pneumonia the rest of his life.

**{¶93}** Here, Elliott's complications arising from the traumatic brain injury and the multiple surgical interventions were reasonable and foreseeable responses to Underwood's repetitive punches to Elliot's head -- not mere coincidences. That an elderly man who suffered a subdural hematoma requiring serious surgery would subsequently develop complications requiring a tracheostomy and a feeding tube and further, that the elderly man would

experience confusion and subsequent poor decision-making, such as telling his family he wanted to leave the nursing home which was against medical advice, is not abnormal or unforeseeable. The complications which arose during the extended hospitalization and at the nursing home facility did not break the chain of causation so as to relieve Underwood from criminal liability for voluntary manslaughter related to the blunt force trauma, traumatic brain injury initially incurred by Elliott when he received multiple punches to the head and face.

**{¶94}** Despite the existence of subsequent complications, namely the aspiration pneumonia, leading to Elliott's death, Underwood was "responsible for the natural consequences of his actions and the multiple causes are not a defense." *State v. Nichols,* 11th Dist. Lake No. 2005-L-017, 2006-Ohio-2934, ¶ 50. Although Elliott's death may not have been "the immediate or most obvious result" after the repeated beating about the head and face on February 3, 2020, it was the natural and foreseeable consequence of the actions that followed "in the ordinary course of events." *See Johnson* at ¶ 23 (internal citations omitted.)  *See also State v. Banks*, 8th Dist. Cuyahoga No. 76271, 2000 WL 776989 (June 15, 2000), at *8 (fact that victim contracted pneumonia in hospital did not absolve Banks of consequences of stabbing victim which led directly to his admittance to hospital).

**{¶95}** Therefore, after viewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence for a rational trier of fact to find that all the essential elements of voluntary manslaughter, including causation, have been proven beyond a reasonable doubt. That is, the

uncontroverted evidence was sufficient for the jury to determine that Underwood knowingly caused Elliott's death as a result of the February 3, 2020 beating.

**{¶96}** Additionally, the substantial weight of the evidence established that Underwood and his son mercilessly and repeatedly punched the older man in the face and the head, resulting in the traumatic brain injuries and resulting complications as testified by the medical experts. The weight of the evidence supports the jury finding that Underwood was guilty of voluntary manslaughter. " 'Even in acting as a thirteenth juror we must still remember that the weight to be given evidence and the credibility to be afforded testimony are issues to be determined by the trier of fact.' " *State v. Smallwood,* 4th Dist. Highland No. 20CA1, 2021-Ohio-1103, ¶ 11, quoting *State v. Hoskins,* 4th Dist. Adams No. 19CA1093, 2019-Ohio-4842, ¶ 20, citing *State v. Frazier,* 73 Ohio St.3d 323, 339, 652 N.E.2d 1000, citing *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50. As previously discussed, as an appellate court, "[w]e defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *Id.*, citing *State v. Reyes-Rosales,* 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17; *State v. Wells,* 4th Dist. Lawrence No. 18CA23, 2019-Ohio-3799, ¶ 10-11. The jury neither lost its way nor created a manifest miscarriage of justice by so finding. Therefore, viewing the evidence in its totality, and deferring to the jury's credibility determination, we cannot conclude that this is an exceptional case in which the evidence weighs heavily against the conviction.

3. Firearm Specification

**{¶97}** Underwood contends that his conviction for voluntary manslaughter with a firearm specification was against the manifest weight of the evidence because the evidence at trial showed that the gun was inoperable. However, as we discussed in our review of the jury instruction on the firearm specification, the State presented sufficient evidence that the gun was operable and that it was able to fire a shot and injure Sabrina. Although it fell to the ground and became jammed, law enforcement was able to unjam it and dislodge the bullet with a knife. Underwood's statement was that he could see the bullet was "sideways." Thus, although it was inoperable at the time Underwood fired it at Elliott, the State presented sufficient evidence that the firearm could readily be rendered operable by simply dislodging the sideways bullet.

**{¶98}** After reviewing the evidence, we conclude that Underwood's conviction for firearm specification is not against the manifest weight of the evidence; the trier of fact did not lose its way when it convicted him of this charge. It was undisputed that the gun discharged and fired a bullet into Sabrina, injuring her. Underwood admitted he picked up the gun and tried to shoot Elliott but could see that the bullet had jammed. Law enforcement testified that they dislodged the bullet with a knife. After reviewing the evidence, we are not persuaded that the trier of fact lost its way and created a manifest miscarriage of justice. Our review of the record reveals that the State presented substantial evidence from which the trier of fact could conclude, beyond a

reasonable doubt, that Underwood was guilty of voluntary manslaughter with a firearm specification.

**{¶99}** For the foregoing reasons, Underwood's second assignment of error is hereby overruled.

### C. Ineffective Assistance of Counsel

**{¶100}** For his third assignment of error, Underwood contends that his trial counsel was ineffective for failing to move for an acquittal on the firearm specification, failing to object to the jury instruction on the firearm specification, and failing to retain an expert to dispute Elliott's cause of death.

### 1. Standard of Review

**{¶101}** To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *State v. Trout,* 4th Dist. Scioto No. 19CA3866, 2020-Ohio-3940, ¶ 31; *State v. Wilson,* 4th Dist. Lawrence No. 18CA15, 2019-Ohio-2754, ¶ 25; *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113; *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Ohio a properly licensed attorney is presumed competent. *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. Thus, in reviewing the claim of ineffective assistance of counsel, we must indulge in "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Wilson, supra*, quoting *Strickland* at 697, 104 S.Ct. 2052. Failure to satisfy either part of the test is fatal to the claim. *Id.*; *State v. Bradley,* 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989); *State v. Ruble,* 2017-Ohio-7259, 96 N.E.3d 792, ¶ 47 (4th Dist.).

2. Failure to Move for Acquittal or
Object to Jury Instruction on Firearm Specification

**{¶102}**        Considering our resolution of Underwood's first and second assignments of error concerning the firearm specification, we reject his argument that his counsel was ineffective for failing to object to the jury instruction or by failing to move for an acquittal on the firearm specification. Specifically, we found that the trial court did not commit plain error by giving a firearm specification instruction to the jury – there was sufficient evidence for the jury to make a determination about the operability of the firearm. And, we found that his conviction on the firearm specification was not against the manifest weight of the evidence because the evidence showed that the gun was jammed by a sideways bullet and law enforcement readily unjammed it with a knife.

**{¶103}**        Because neither of these assignments of error are meritorious, Underwood cannot show prejudice resulting from his counsel's failure to object to the jury instruction or move for an acquittal on the firearm specification. Moreover, his counsel's efforts in that regard would have been futile. "The law does not require counsel to take a futile act." *State v. Conant*, 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, ¶ 30; *State v. Colonel,* 2023-Ohio-3945, 227 N.E.3d 336, ¶ 62 (4th Dist.). Underwood's counsel's performance was not deficient for

failing to make objections to the jury instruction on the firearm specification or move for an acquittal on it.

### 2. Failure to Present Expert Testimony on Cause of Death

**{¶104}**     Underwood asserts that expert testimony was central to the prosecution's case and that his trial counsel erred by failing to consult an expert who could meaningfully assist him in defending the charges. Underwood contends the failure to obtain a defense expert prejudiced him because there was no evidence to contradict the State's theory of proximate cause, as testified by Dr. Uptegrove, and especially given the extended time and intervening events between February 3, 2020, and April 29, 2020. For the reasons which follow, we find no merit to Underwood's contention.

**{¶105}**     The failure to call an expert witness and instead rely on cross-examination of the State's expert witness does not constitute ineffective assistance of counsel. *State v. Jackson,* 10th Dist. Franklin No. 02AP-867, 2003-Ohio-6183, ¶ 76; *State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001); *State v. Rutter*, 4th Dist. Hocking No. 02CA17, 2003-Ohio-373, ¶ 27. Sometimes, trial counsel's decision not to seek expert testimony " 'is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.' " *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 90, quoting *State v. Glover,* Clermont App. No. CA2001-12-102, 2002-Ohio-6392, ¶ 95. "Further, even if the wisdom of such an approach is debatable, 'debatable trial tactics' do not constitute ineffective assistance of counsel." *Id.*, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1960).

{¶106}        In this case, Underwood had retained counsel. Due process requires that an indigent criminal defendant be provided funds to obtain expert assistance at State expense where the trial court finds in the exercise of its sound discretion a particularized showing of a reasonable probability that the requested expert would aid in the defense and that the denial of the request would result in an unfair trial. *State v. Neeley,* 2d Dist. Montgomery No. 20842, 2006-Ohio-418, ¶ 30; *State v. Mason,* 82 Ohio St. 3d 144, 1998-Ohio-370, 694 N.E.2d 932. Underwood asserts that the absence of expert testimony prevented counsel from testing the soundness of the prosecution's expert conclusions. While Underwood asserts this broad and conclusory argument, there is nothing in this record showing a reasonable probability that an expert would have aided in his defense.

{¶107}        In *Neeley*, the defendant was convicted of murder after admittedly kicking his victim in the head several times. Neeley and the victim had been drinking with other men and the victim was described as highly intoxicated, "barely able to stand." On appeal, Neeley argued that his counsel performed deficiently because he did not request appointment of an expert to evaluate the victim's medical condition and the medical records and reports in order to determine whether the victim's level of intoxication, in addition to the medical procedures and surgery he underwent before dying 36 hours after the attack, may have contributed to his death.

{¶108}        The Second District described the medical evidence as "fairly straightforward," that *Neeley's* victim did not die as a result of alcohol in his system or medical treatment he received but because of the traumatic brain injury, swelling

of the brain, caused by the blunt force trauma to his head. The court also noted there was nothing in the record even remotely suggesting that the medical treatment was an independent intervening cause. The court concluded that because the record did not contain a basis to make a particularized showing that a medical expert would have aided Neeley's defense, Neeley was not entitled to have an expert at State expense. Therefore, counsel did not perform deficiently by failing to request the assistance of a defense expert.

**{¶109}**     In *State v. Fraker,* 3d Dist. Union No. 14-12-19, 2013-Ohio-4561, Fraker alleged that his trial counsel was ineffective due to a failure to obtain a medical expert who could provide an alternative causation for a child victim's injuries. The appellate court noted that Fraker's trial counsel did initially argue for an appointment of a medical expert but did not pursue the matter further after a hearing before the trial court. The appellate court concluded:

> We will not speculate about the reasons behind the trial counsel's actions or inactions in this respect because there is nothing to show that Fraker would have been found not guilty had the testimony of the medical expert been provided.  First, there's nothing more than a mere speculation in the appellate brief to show that an expert would have testified to an alternative causation. * * * Second, there is no indication in the record that an alternative causation would have been supported by the evidence, even if the expert had asserted it. Indeed, the record does not show anything indicating a possible cause for C.F.'s subdural and retinal hemorrhages that would exclude Fraker's involvement. * * * Considering the totality of the circumstances, we cannot say that the trial counsel's failure to obtain a medical expert refuting a finding of a shaken baby syndrome prejudiced Fraker "to such a degree as to make the outcome of the trial unreliable."  *See State v. Frazier,* 61 Ohio St.3d 247, 254, 574 N.E.2d 483, 489 (1991).

*Fraker* at ¶ 53-55.

{¶110}     In Underwood's case, the record is silent as to why a defense expert was not obtained and called at trial. Based on our review, however, we consider this a matter of trial strategy and we do not find Underwood was rendered ineffective assistance of counsel by the failure to provide a defense expert's testimony at trial.

{¶111}     As previously discussed, Dr. Uptegrove testified that Elliott's cause of death was, to a reasonable degree of medical certainty, a result of complications of blunt force injury. He testified there were no independent intervening causes of death after the traumatic brain injury. Although the toxicology report showed Alprozolam in Elliott's system, the level of the drug was well below that seen in overdose cases. Dr. Uptegrove ruled out drug overdose or intoxication as a cause of death. Elliott's lungs were described as "heavy" with "microscopically identifiable areas of infection and inflammation." Dr. Thompson also testified that Elliott's aspiration pneumonia was proximately related to the injuries he received in the assault.

{¶112}     Defense counsel utilized the medical records and cross-examination testimony to emphasize to the jury that Elliott was improving prior to his death and that his death was caused by the decision to leave Edgewood Manor against medical advice and the resulting consequences. Defense counsel vigorously cross-examined the State's medical witnesses, lay and expert. At every opportunity, defense counsel emphasized Elliott's favorable Glasgow coma score

(GCS).[9] The scale has three components:  eye, motor, and vocalization. The ultimate score is 15, meaning more alert and more responsive. On cross-examination, Terry Crothers, the very first responder testified that he measured Elliott's GCS at 11 out of 15. Hagler testified that during flight, he gave Elliott a 15 on the GCS. Elliott's blood pressure was within normal limits, and he described Elliott as "fairly stable."

{¶113}      Dr. Young admitted on cross-examination that he was primarily relying upon the records for his testimony. He did not perform the actual GCS scoring. He testified Elliott was alert and oriented and denied pain going into surgery. Elliott's respiratory rate, oxygenation, and body temperature were normal. Dr. Thompson admitted on cross-examination that the medical records reflected Elliott was gradually improving when he was discharged from the hospital on March 24, 2020. Finally, Dr. Provaznik admitted on cross-examination that upon discharge, he had not recommended hospice care for Elliott. Elliott had been making gradual improvement and had not been in steady decline at the nursing home.

{¶114}      Defense counsel also attempted to discredit Elliott's family physician, Dr. Farinet. On cross-examination, Dr. Farinet admitted that she was not aware of the actual care he received during his lengthy hospitalization. She was not aware he had pneumonia. She did not speak to his doctor or caregivers at Edgewood Manor. She was unaware he was making gradual improvement. She

---

[9] Hagler, the flight paramedic testified that the GCS is a gauge of mental status and the central nervous system. Dr. Young testified the GCS was developed to indicate a person's level of consciousness.

stood by her decision to prescribe Xanax for Elliott, though it was controversial. She testified family members relayed the information that Elliott wanted his medications.

{¶115}        On cross-examination, Dr. Juschka, the hospice director admitted he never saw Elliott and only reviewed a hospice nurse's evaluation. He never reviewed Elliott's records of hospitalization or skilled nursing care. He was unaware the nursing home discharge was against medical advice. He did not recall speaking with hospice nurses. He acknowledged that with proper treatment, people can live for some time after surviving aspiration pneumonia.

{¶116}        After Dr. Uptegrove testified about Elliott's autopsy and gave his opinion on direct, defense counsel elicited testimony that Dr. Uptegrove did not conduct the actual toxicology screen described in the autopsy report. Dr. Uptegrove reviewed the results of a post-surgery CT scan and testified that what he viewed during the autopsy was consistent with a "natural healing process." While Elliott had lost weight during hospitalization, Dr. Uptegrove described him as "well-nourished." He also testified that the condition of Elliott's lungs was a greater detriment contributing to his death than the actual brain injury.

{¶117}        However, on redirect, Dr. Uptegrove testified that Elliott's respiratory issues began in the hospital. He was susceptible to infections while hospitalized. Elliott, however, did not die of liver failure or drug intoxication.  His cause of death was nothing other than complications of the blunt force trauma. On redirect, Dr. Young also testified that just because a person has a high GCS

number does not mean there is not a traumatic brain injury. There may be a lucid period after a head injury but as bleeding inside continues, the patient will worsen.

{¶118} Based on the foregoing, we find it to be a matter of trial strategy that Underwood's trial counsel did not call a defense expert. We cannot find that counsel performed deficiently by making this strategic choice. Because Underwood has failed to show deficient performance by trial counsel, his argument that his counsel rendered ineffective assistance by failing to obtain an expert is without merit.

{¶119} Based on the foregoing, we overrule the third assignment of error.

### D. Underwood's Sentence

{¶120} For his fourth assignment of error, Underwood contends that his sentence, which is a prison term of 13 to 18 years, is too harsh. He argues he acted because he was provoked when Elliott waved a loaded gun around Sabrina and his sons and his sentence does not reflect this.

### 1. Standard of Review

{¶121} When reviewing felony sentences, appellate courts apply the standard of review outlined in R.C. 2953.08(G)(2). *State v. Daniels*, 4th Dist. Adams No. 22CA1157, 2023-Ohio-2043, ¶ 6; *State v. Prater,* 4th Dist. Adams No 18CA1069, 2019-Ohio-2745, ¶ 12, citing *State v. Graham,* 4th Dist. Adams No. 17CA1046, 2018-Ohio-1277, ¶ 13. Under R.C. 2953.08(G)(2), the appellate court's standard of review is not whether the sentencing court abused its discretion. Instead, R.C. 2953.08(G)(2) specifies that an appellate court may increase,

reduce, modify, or vacate and remand a challenged felony sentence if the court

clearly and convincingly finds either:

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

**{¶122}**     A defendant bears the burden to establish, by clear and

convincing evidence, that a sentence is either contrary to law or that the record

does not support the specified findings. *State v. Poole,* 4th Dist. Adams No.

21CA1151, 2022-Ohio-2391, ¶ 11, citing *State v. Behrle,* 4th Dist. Adams No.

20CA1110, 2021-Ohio-1386, ¶ 48; *State v. Smith*, 4th Dist. Gallia No. 22CA3,

22CA4, 2023-Ohio-681, ¶ 12; *State v. Helterbridle*, 4th Dist. Adams No.

21CA1149, 21CA1150, 2022-Ohio-2756, ¶ 9. "Clear and convincing evidence is

that measure or degree of proof which is more than a mere 'preponderance of the

evidence,' but not to the extent of such certainty as is required, 'beyond a

reasonable doubt' in criminal cases, and which will produce in the mind of the trier

of facts a firm belief or conviction as to the facts sought to be established." *State*

*v. Whitehead,* 4th Dist. Scioto No. 20CA3931, 2022-Ohio-479, ¶ 107, quoting

*Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the

syllabus.

2. Analysis of the Sentence

**{¶123}**     Underwood argues that his sentence is "contrary to law."

'[O]therwise contrary to law' means 'in violation of statute or legal regulations at a

given time." ' " *Daniels* at ¶ 8, quoting *State v. Bryant,* 168 Ohio St.3d 250, 2022-

Ohio-1878, 198 N.E.3d 68, ¶ 22, quoting *Jones* at ¶ 34, quoting Black's Law Dictionary 328 (6th Ed.1990). Underwood was convicted of count two, voluntary manslaughter, R.C. 2903.03(A)/ R.C.2903.03(C), a felony of the first degree. He was ordered to serve a minimum prison term of 10 years, to an indefinite maximum prison term of up to 15 years. Due to the firearm specification, R.C. 2929.145, an additional term of three (3) years was imposed as mandatory and consecutive, to be served before any other time was served. Thus, his sentences, run consecutively, comprised an aggregate term of a minimum prison term of 13 years, with 3 years being mandatory, to an indefinite maximum prison term of up to 18 years.

{¶124}    Underwood asserts that the conduct in this case does not warrant a severe sentence of a minimum term of ten years because he acted in response to Elliott's escalation of events of waving and pointing a loaded gun around Sabrina and their sons. Since Underwood was convicted of voluntary manslaughter and aggravated assault, the jury's verdicts indicate their belief that Underwood reacted to the provocation caused by Elliott. This undermines Underwood's argument that the sentence imposed does not reflect the fact of the victim's provocation of him.

{¶125}    Underwood was sentenced to 10 to 15 years for voluntary manslaughter, a first-degree felony, plus an additional mandatory and consecutive 3-year term for the firearm specification. His total prison term was 13 to 18 years. The possible prison sentences for a first-degree felony are 3, 4, 5, 6, 7, 8, 9, 10, or 11 years. R.C. 2929.14(A)(1). The court sentenced appellant to serve a

minimum prison term of 10 years on this count. Underwood's sentence on voluntary manslaughter falls within the range and thus complies with the applicable statute. It cannot be considered contrary to law on this basis. *See State v. Lechner*, 4th Dist. Highland No. 19CA3, 2019-Ohio-4071, ¶ 53.

**{¶126}**         Additionally, trial courts must consider R.C. 2929.11 and R.C.2929.12 when imposing sentence. R.C. 2929.11 addresses the principles and purposes of felony sentencing. R.C. 2929.12(A) addresses the seriousness of the crime and recidivism factors. R.C. 2929.12(B)-(E) lists various additional factors for courts to consider at sentencing. *Daniels* at ¶ 9. In *Poole,* 4th Dist. Adams No. 21CA1151, 2022-Ohio-2391, at ¶ 17, this court wrote:

> Because both R.C. 2929.11 and R.C. 2929.12 require the trial court to consider the factors outlined in those two statutory provisions, *State v. Wilson,* 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31, then a trial court's failure to consider the factors would render the sentence "in violation of statute" and thus "contrary to law."  This was our established precedent prior to [*State v. Jones,* 163 Ohio St. 3d. 242, 2020-Ohio-6729, 169 N.E.3d 649,] and nothing in our interpretation of *Jones* requires us to abandon it. *State v. Allen,* 4th Dist. Pickaway No. 19CA31, 2021-Ohio-648, ¶ 19 ("under the Supreme Court's decision in *Jones,* a reviewing court no longer needs to determine whether a trial court's consideration of the factors in R.C. 2929.11 and 2929.12 are supported in the record.  The court's consideration of the factors enumerated in these statutes is sufficient"); *see also State v. Neal*, 4th Dist. Lawrence Nos. 14CA31 & 14CA32, 2015-Ohio-5452, ¶ 55 ("A sentence is contrary to law * * * if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12").  "Although a trial court has a mandatory duty to consider the relevant statutory factors under R.C. 2929.11 and 2929.12, the trial court is not required to specifically analyze each factor on the record or to explain its reasoning before imposing a sentence."  *Id*. at ¶ 58; *Jones* at ¶ 20, citing *Wilson*, at ¶ 31.

*See also State v. Young,* 4th Dist. Ross No. 22CA10, 2022-Ohio-4223, ¶ 5.

**{¶127}**     In this case, the trial court had several days of testimony from lay and expert witnesses, and through Underwood's videotaped statement.  Our review of the sentencing entry and the trial transcript reveals that the trial court considered the R.C. 2929.11 and 2929.12 factors when it imposed the sentence. A trial court's statement in its sentencing entry that it considered the applicable statutory factors is sufficient to fulfill a court's obligations under R.C. 2929.11 and 2929.12. *Young* at ¶ 6, citing *Neal* at ¶ 59. The judge stated that he had considered all of the required factors. The court further stated:  "I've considered all of them, both the recidivism more * * * likely factors.  I am going to find that the injuries to the victim Lonnie Elliott were exacerbated by the victim's age, further going to find that the victim suffered serious physical harm as a result of this crime."

**{¶128}**     The trial court's findings at sentencing are sufficient for the record. Additionally, while the trial court did not reference this evidence, we note Underwood's frank discussion with Detective Conkel in his videotaped statement, as follows:

| | |
|---|---|
| Defendant: | [A]fter he had shot her, I started beating the hell out of him. * * * we all beat the hell out of him. |
| Detective Conkel: | So you guys were just punching him basically. |
| Defendant: | Yeah. |
| Detective Conkel: | He get any punches back? |
| Defendant: | Hell no. * * * He wasn't—never had a chance to. |

**{¶129}** Consequently, after our review of the testimony and evidence contained in the trial transcript, we find that Underwood's sentence is not clearly and convincingly contrary to law. Accordingly, we hereby overrule Underwood's fourth assignment of error.

E. Cumulative Error

**{¶130}** In his fifth and final assignment of error, Underwood contends that the cumulative errors made by the trial court and counsel deprived him of a fair trial and due process of law.

**{¶131}** Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, 96 N.E.3d 792, ¶ 75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith*, 2016-Ohio-5062, 70 N.E.3d 150, ¶ 106 (4th Dist.), citing *State v. Harrington*, 4th Dist. Scioto No. 05CA3038, 2006-Ohio-4388, ¶ 57. The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 148 ("And to the extent that Mammone more broadly invokes the doctrine of cumulative error, that doctrine does not apply because he cannot point to 'multiple instances of harmless error.' "); *State v.*

*Fannon*, 2018-Ohio-5242, 117 N.E.3d 10, ¶ 124-125 (4th Dist.); *State v. Thacker*, 4th Dist. Lawrence No. 19CA18, 2021-Ohio-2726, ¶ 69-71.

{¶132}    Here, because we found no errors, the cumulative error doctrine does not apply.  *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 173; *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 253 (doctrine of cumulative error is not applicable where there are not numerous instances of trial-court error and defendant was not prejudiced by any error at the trial or penalty phase of the proceedings); *State v. Colonel*, 2023-Ohio-3945, 227 N.E.3d 336, ¶ 64-67 (4th Dist.) (cumulative error doctrine does not apply where there are no errors); *State v. Ludwick*, 4th Dist. Highland No. 21CA17, 2022-Ohio-2609, ¶ 53-57 (cumulative error doctrine does not apply where there was only one harmless error found); *State v. Spring*, 2017-Ohio-768, 85 N.E.3d 1080, ¶ 59 (7th Dist.) (cumulative error doctrine does not apply to one or two minor errors).

{¶133}    Accordingly, Underwood's final assignment of error is overruled.

## IV.    CONCLUSION

{¶134}    We overrule all of Underwood's assignments of error and affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

Smith, P.J.:  Concurring in judgment only as to Assignment of Error One, Part 4. Concurring in Judgment and Opinion as to all other Assignments of Error.

{¶135}      While I agree that the principal opinion is legally correct, I write separately to express my frustration with the current status of the law.  The trial court instructed the jury to consider whether Underwood used a firearm during the commission of his other crimes.  Underwood has challenged the provision of the firearm specification instruction under his first assignment of error.  The majority concludes that there was sufficient evidence in this record that the gun could readily be made operable and finds that the trial court did not commit plain error when it gave a jury instruction as to the firearm specification.  While I agree with my colleagues' analysis under the current law, I fundamentally disagree with the case law regarding sufficient evidence of "operability" as it has evolved since the Supreme Court's pronouncement in *State v. Murphy,* 49 Ohio St.3d 206, 551 N.E.2d 932 (1990).

{¶136}      In *Murphy*, the issue before the court was whether the firearm specification in R.C. 2929.71 could be proven beyond a reasonable doubt without actually presenting scientific evidence or direct evidence as to the operability of the firearm.  Reaffirming the Court's prior holding in *State v. Gaines,* 46 Ohio St.3d 65, 545 N.E.2d 68 (1989), that, "[P]rior to the imposition of an additional term of three years' actual incarceration for possession of a firearm during the commission of a felony, the State must prove beyond a reasonable doubt that the firearm was operable or could readily have been rendered operable at the time of the offense."

*Murphy* modified *Gaines* as to the *type* of evidence which is required to prove this specification beyond a reasonable doubt.

{¶137}       In *Murphy*, the sufficient evidence of operability constituted evidence that the gun was wrapped in a shirt, that witnesses described the gun, and that Murphy stated he "would kill" the clerk.   Based on the totality of that evidence, the *Murphy* court concluded that the proof of the existence of the firearm may be based on lay testimony and is not dependent upon an empirical analysis of the firearm.  "Such proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime. (*State v. Gaines* [1989], 46 Ohio St.3d 65, 545 N.E.2d 68, modified.)" *Murphy, syllabus.*

{¶138}       *Murphy* was superseded by statute, R.C. 2923.11(B)(2) as amended June 6, 1990, relevant herein and discussed below.[10]   In *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541, (1997), the Court added circumstantial evidence as a basis for proof:

> A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm. (*State v. Murphy* [1990], 49 Ohio St.3d 206, 551 N.E.2d 932, *State v. Jenks* [1991], 61 Ohio St.3d 259, 574 N.E.2d 492, and *State v. Dixon* [1995], 71 Ohio St.3d 608, 646 N.E.2d 453, followed; R.C. 2923.11[B][1] and [2], construed and applied.)

---

[10] Justice Sweeney's dissenting opinion in *Murphy* found that the statute made clear that "operability" was an essential element, that the state had failed to "maintain its burden of proof," and opined that the court had "amend[ed] the statute under guise of judicial interpretation."

*Thompkins*, paragraph one of the syllabus.

**{¶139}**        R.C. 2941.145(A) provides that a three-year mandatory prison term for a firearm specification is precluded unless the indictment or charging offense specifies, and the State establishes, that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."   Under R.C. 2923.11(B), the legal definition of "firearm" is as follows:

(1) "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant.  "Firearm" includes an unloaded firearm, and any firearm that is inoperable but that can be readily rendered operable.

(2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact must rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.

**{¶140}**        The case law interpreting this statute has evolved over the years.  *State v. Watkins*, 8th Dist. Cuyahoga No. 84288, 2004-Ohio-6908, ¶13. The State can prove that a firearm was operable or readily rendered operable in a variety of ways.  *See State v. Marneros*, 8th Dist. Cuyahoga No. 109528, 2021-Ohio-2844, ¶ 29. "There exists a litany of Ohio cases that address the proof required to establish a firearm specification." *State v. Roscoe,* 8th Dist. Cuyahoga No. 99113, 2013-Ohio-3617, ¶ 30.

**{¶141}** Courts have differed in interpreting *how much* circumstantial evidence is enough to prove the existence of an operable firearm in the commission of a crime. *Watkins* at ¶ 16. As the principal opinion observed, this court and other Ohio courts have found circumstantial evidence of operability where ammunition is discovered loaded into a gun or alongside a gun that is capable of firing it. *See Pope* at ¶ 10; *State v. Allah*, 4th Dist. Gallia No. 14CA12, 2015-Ohio-5060, ¶ 13; *State v. Smith,* 4th Dist. Pickaway No. 19CA33, 2021-Ohio-2866, ¶ 58-62; *State v. Tillman,* 6th Dist. Fulton No. F-11-006, 2012-Ohio-5265, ¶ 15; *State v. Hunter,* 9th Dist. Medina No. 17CA0069-M, 2018-Ohio-4249, ¶ 8; *State v. Dickerson,* 11th Dist. Ashtabula No. 2013-A-0046, 2015-Ohio-938, ¶ 36. Sufficient evidence of operability has been established where the officer who test-fired a gun did not testify in court and "the only evidence that Officer Shaw's test fire was successful was that Officer Shaw told him over the phone that the gun fired." *State v. Hughes,* 1st Dist. Hamilton No. C-230239, 2024-Ohio-834, ¶ 22. *See also* our own decision in *State v. Stevens*, 2023-Ohio-3280, 224 N.E.3d 624, (4th Dist.), *appeal not accepted*, 173 Ohio St.3d 1445, 2024-Ohio-1228, 230 N.E.3d 1217, wherein firearm specification was upheld where testimony was that victim kept a loaded pistol in his bedroom and "several of the firearms in his safe worked." *Stevens* at ¶ 66.

**{¶142}** Additionally, case law supports conviction when a defendant flashes what appears to be a gun, even if it is never proved to be a gun or to be operable. *State v. Dixon,* 71 Ohio St.3d 608, 646 N.E.2d 453 (1995); *State v. Nelson,* 2nd Dist. Montgomery No. 14775, 1995 WL 491084 (Aug. 18, 1995). This

is so even if the offender never states that he will use the gun if the victim does not comply with his orders; "the implicit threat of brandishing a firearm so as to threaten a victim is sufficient to establish its operability under R.C. 2923.11(B)." *State v. McDade*, 11th Dist. Lake No. 97–L–059, 1998 WL 682360 (Sept. 25, 1998). The State need not even actually recover the firearm used in the offense nor perform tests to prove that it was operable. *See State v. Lind,* 9th Dist. Summit No. C.A. NO. 30416, 2023-Ohio-3519, ¶ 10, quoting *State v. Spikes,* 9th Dist. Lorain No. 05CA008680, 2006-Ohio-1822, ¶ 25.

{¶143}      In my view, the failure to require empirical evidence of some sort, via an operability report or testimony of a qualified person who has test-fired the firearm, has lent itself to inconsistent decisions. In my view, courts have found sufficient evidence of operability while actually engaging in speculation. More often than not, I fear courts are making "inferential leaps" to find operability. *See Sanders v. McMackin*, 786 F. Supp. 672, 676 (N.D.Ohio 1992).

{¶144}      In Underwood's case, the circumstantial evidence supporting a firearm specification, "operability" in particular, is as follows:

> Underwood's son Devyn testified that Underwood retrieved the gun from the ground and pointed it at Elliott's head. * * * [I]t did not fire when he pulled the trigger. Underwood admitted he wanted to shoot Elliott. According to Underwood's recorded statement:

> He - - when he fell he must have dropped it. Well, as soon as I seen it, I grabbed the gun, and I was gonna try to shoot him with it, and the gun had locked up. I could see the bullet sideways in the chamber.

> ***

Detective Conkel testified that when she took the firearm into evidence, it had a bullet inside the barrel of the gun. There was also a magazine with a bullet inside the magazine. The magazine had been inserted into the gun backward. Underwood also told Conkel that he had removed the magazine and reinserted it backward into the gun so that the bullet would not feed into the chamber. Conkel also testified that the area where the bullet would exit was impacted with mud and rocks and that Detective Spencer was able to dislodge the bullet out of the gun barrel using a knife.

{¶145} To be sure, there is evidence that Underwood possessed the firearm and brandished it by pointing it at his already assaulted victim. However, I disagree that sufficient evidence demonstrates this firearm was operable or could be readily made operable at the time Underwood possessed it. " '[T]he mere possession of a gun, without something more, is not enough to allow for a finding that it is operable.' " *State v. Elliott*, 2022-Ohio-3778, 199 N.E.3d 944, ¶ 69 (3d Dist.), quoting *In re S.D.,* 1st Dist. Hamilton No. C-180651, 2020-Ohio-941, ¶ 11. There is nothing in this record from which to make the inference that the firearm could *have readily been rendered* operable when it was in Underwood's possession. Therefore, I would have found that the trial court did commit plain error when it gave the jury instruction as to the firearm specification.

{¶146} The majority finds that Underwood failed in his burden to established that an error occurred, that it was obvious, and that it affected his substantial rights because the evidence was undisputed that the gun had been used *moments before* Underwood grabbed it. The majority finds sufficient evidence that the gun could be made readily operable although the bullet was jammed because the jam was cleared with a knife. However, once the officer began working with the gun, how long did it actually take him to clear the jam? If

the removal was at all time-consuming, how can the gun be found to be capable of being made readily operable? This evidence is not in this record.

**{¶147}**         The principal opinion cites *State v. Stubblefield,* 8th Dist. Cuyahoga No. 90687, 2008-Ohio-5348. In *Stubblefield,* the police recovered the gun from the garage roof without a firing pin. A police officer testified that the gun was inoperable without the firing pin, but he also described how he placed a firing pin in the gun and then successfully test-fired the gun. He told the court that the gun "could be made to be operable, through my experience, by placing a pin in it." The officer went on to agree that a firing pin could be kept in one's pocket and be inserted into the gun "relatively easily." With the absence of any evidence to the contrary, the court found that the officer's testimony was legally sufficient to show that the gun could "readily be rendered operable." The *Stubblefield* court observed at ¶ 9:

> The requirement that a gun be either operable or *readily capable* of being rendered operable is meant to distinguish irretrievably broken guns from guns that are either fully functioning or temporarily non-functioning. A gun that jams is only temporarily non-operational because the jam can be cleared-in such cases, the gun is capable of being readily rendered operable. *See State v. Easley*, 10th Dist. Franklin No. 07AP-578, 2008-Ohio-468, ¶ 43; *State v. Griffin* (Feb. 28, 1996), Lorain App. No. 95CA006069. On the other hand, a gun with excessive rusting may be inoperable. While the rust might be cleaned in such a way as to render the gun operable, the removal of the rust might be so time-consuming that the gun could not be said to be capable of being "readily" operable.

Ultimately, whether a gun can be *readily rendered operable* is a question of fact. *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541, 1997-Ohio-52, paragraph one of the syllabus.

{¶148}		In *State v. Kovacic,* 11th Dist. Ashtabula No.2002-A-0032, 2003-Ohio-5219, Judge Cynthia Wescott Rice explained that "a statement by a defendant that he has a gun, without more, does not transform the so-called gun into a 'firearm' for purposes of R.C. 2923.11 or 2941.145." Moreover, she wrote, "To allow this conceptual morph would reduce the burden on the prosecution and thereby fracture appellant's due process rights." *Id.* at ¶ 19. Judge Rice wrote:

> However, assuming arguendo, that appellant's statement and conduct were sufficient to establish, circumstantially, that appellant had a weapon within the purview of R.C. 2923.11(B), his blank declaration that he had a gun, without a greater indicia of evidence, is insufficient to prove operability. To wit, under the totality of the circumstances, the clerk never saw a gun nor any bullets and did not smell gunpowder; moreover, there is no evidence that appellant's statements or actions could be interpreted as explicit threats.

*Id.* at ¶ 21 (footnote omitted). The court further explained:

> * * * as a matter of law and logic, that appellant's actions did not amount to an implicit threat insofar as appellant's declaration did not necessarily portend danger or express a desire to inflict injury on the clerk. Although appellant's hand was in his pocket and he indicated he had a gun, we cannot tacitly infer, from the surrounding circumstances, that he had an operable firearm.

*Id.* at ¶ 22.[11] Based on my review of the appellate cases, courts have often used a less stringent standard than the analysis discussed in *Kovacic.*

---

[11] Justice Grendell, dissenting, found the impact of the majority opinion "troublesome and extremely dangerous." She wrote "Such an approach would be contrary to the purpose behind the additional firearm specification punishment- to deter the involvement of a firearm in a crime. The majority's approach invites active involvement of a firearm in a crime as a prerequisite for conviction on a firearm specification. Even worse, the majority's approach could be misconstrued as a road map for criminals, who will seek to avoid the additional firearm specification penalty by concealing the weapon during the commission of a robbery. This in turn will only serve to increase the risk of harm to store clerks who unfortunately challenge such criminals because of the lack of a visible weapon.

**{¶149}**         The *Kovacic* court decided *State v. Tyler,* 11th Dist. Portage No. 2012-P-0041, 2013-Ohio-3393 ten years later.   In this case the majority affirmed Tyler's conviction on a firearm specification and Judge Rice dissented. Tyler testified she carried a black broom handle during a robbery whereas the victim testified that she pointed a gun directly at him, that he was able to observe both the barrel and "clip" of the weapon, and that he was "one hundred per cent sure it was a gun."  The gun was not recovered at the crime scene.  With respect to operability, the victim testified that he heard a voice say "Hold it right there dude." Then he turned and observed an individual pointing a black gun at him.  The victim retreated and ran to avoid being shot.  The court noted that he obviously viewed Tyler's actions as an implicit threat.  The majority concluded that "Ordering the victim to hold it right there while pointing a gun at him satisfies the proof requirements stated in *Thompkins* as it constitutes both brandishing and an implicit threat.

**{¶150}**         Judge Rice wrote that she would find there was insufficient evidence to support the firearm specification.   Referencing *Thompkins*, Rice recognized the General Assembly's enactment of (former) R.C.2929.71 [now codified under R.C. 2929.14] and intent to send a message to the criminal world: " 'If you use a firearm you will get an extra three years of incarceration.' "  *Tyler* at ¶ 55, quoting *Thompkins* at 385.  She also acknowledged that the Supreme Court has determined that an implicit threat is enough to prove a firearm is operable or can be readily rendered operable.  However, Judge Rice continued:

> While I see a logical disconnect in equating implicitly
> threatening conduct with the capacity of a firearm to discharge

a projectile with a combustible propellant, it is not my station to question the Court's wisdom on its rulings or the policies and/or beliefs that animate those determinations. Still, if, as the Supreme Court has held, an implicit threat is sufficient to prove operability, a material element of a firearm specification, then justice demands that the threat provide some non-speculative indicia of the defendant's then-present intent to act on that threat. Unless the state can meet this requirement, the state's burden of production is necessarily reduced and a defendant's due process rights fractured. *Kovacic, supra*, at ¶ 19. Here, appellant's simple admonishment that Ms. Masahu essentially "stay put" does not, in my view, prove her weapon was an operable firearm justifying the three-year mandatory enhancement.

*Tyler* at ¶ 56.

**{¶151}** I find the court's decision in *State v. Chapman*, 12th Dist. Butler No. CA2018-03-046, 2018-Ohio-4560, to be somewhat more analogous to ours. Chapman was convicted of felonious assault of his girlfriend, and the attendant three-year firearm specification. On appeal, Chapman argued that the firearm specification was not supported by sufficient evidence because the State offered no evidence, direct or circumstantial, that the firearm he used as a "bludgeon" to beat the victim was operable when the offense occurred. The appeals court agreed.

**{¶152}** Citing *Kovacic, Chapman* noted that operability is an essential element of the offense. *Id.* at ¶ 23. The *Chapman* court also noted that the plain language found in RC. 2941.145(A) indicated that the General Assembly intended a harsher penalty when an offender "displayed" or "used" a firearm to facilitate the charged offense at the time the offense occurred. The court continued:

[A]lthough there can be no doubt that Chapman "displayed" and then "used" a firearm as a "bludgeon" to beat L.B. over the head in a more general sense, under the law of this state,

to sustain a firearm specification, the state must prove beyond a reasonable doubt that the defendant possessed a firearm that was operable, or capable of being readily rendered operable, at the time the offense occurred. In this case the state failed to meet its burden. (Citations omitted.)

Simply because Chapman displayed a firearm and then used the firearm as a "bludgeon" to beat L.B. on the head rather than to shoot her (or threaten to shoot her) does not mean the firearm was operable, or capable of being readily rendered operable, at the time the offense occurred. To hold otherwise would allow for a firearm specification conviction based on mere possession of a firearm alone without any evidence as to the operability of said firearm. Such a holding would be in direct conflict with the plain language used by the General Assembly in crafting the firearm specification statute as found under R.C. 2941.145(A) and the definition of "firearm" as provided by R.C. 2923.11(B)(1).

*Chapman* at ¶ 27-28.

**{¶153}** While mindful that Underwood and Chapman had already engaged in assaulting their victims, the plain language of the statute requires that a gun be operable or readily made operable. As in *Chapman*, I believe it is reasonable to find that Underwood only possessed the gun. But as the law as it has evolved since *Murphy* has allowed for an expansive view, I do not dissent from the principal opinion.[12]

---

[12] If empirical evidence establishing operability, or that a weapon was "capable of being made readily operable" was required, it would seemingly alleviate the concerns expressed by Judge Grendell in her dissenting opinion in *Kovacic*. And, while in every case, empirical evidence of operability will not be so fully satisfied as in *State v. Marneros, supra,* (where operability was proven by an expert witness clearly qualified through a Bachelor of Science degree in forensic science, training and certification by the Bureau of Alcohol, Tobacco, Firearms and Explosives, and previous experience test-firing over 400 firearms and explaining her testing and results), operability could also be sufficiently established by testimony from a law enforcement officer whose responsibilities include testing firearms and who has test-fired the weapon at issue. *See State v. Taylor,* 9th Dist. Lorain No. 18CA011330, 2019-Ohio-1275, ¶ 8.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that the costs shall be assessed to the appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J.: Concurs with Concurring Opinion.
Wilkin, J.: Concurs in Judgment and Opinion.


For the Court,


_____
Michael D. Hess
Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**