[Cite as *Lakewood v. Jones*, 2024-Ohio-3006.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

CITY OF LAKEWOOD,                    :

    Plaintiff-Appellee,              :              No. 113011

v.                                   :

ANGEL JONES,                         :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2024

---

Criminal Appeal from the Lakewood Municipal Court
Case No. 2022-CRB-00962

---

### *Appearances:*

Andrew N. Fleck, Assistant Prosecutor for the City of Lakewood, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Thomas T. Lampman, Assistant Public Defender, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Angel Jones, appeals her conviction for aggravated menacing following a bench trial. She contends that there was

insufficient evidence on the mens rea element of the charge to support her conviction. For the reasons that follow, we affirm the trial court.

**Procedural and Factual Background**

{¶ 2} On October 24, 2022, Jones was charged with one count of aggravated menacing in violation of R.C. 2903.21, a first-degree misdemeanor. The charge related to a telephone call Jones made to the leasing office for AIY Properties ("AIY") on October 22, 2022, during which Jones allegedly threatened to come to the leasing office and shoot Rachel Jay, a leasing agent for AIY, and anyone else in the building. Jones pled not guilty to the charge.

{¶ 3} On July 17, 2023, the case proceeded to a bench trial. Two witnesses testified for the city of Lakewood — Jay and Lakewood police officer, Meghan Mauser. Jones testified in her defense.

{¶ 4} Jay testified that on October 22, 2022, she was working as a leasing agent at AIY, a property management company, in Lakewood when she received a telephone call from Jones, who was then a tenant at Park Towers, an apartment complex managed by AIY, in Fairview Park, Ohio. Jay stated that Jones identified herself to Jay and that the telephone's caller ID also identified the caller as Jones. Jay stated that she had never spoken with Jones before but was aware that there had been "a couple of complaints" lodged against Jones for "small things," such as "loud music."

{¶ 5} Jay testified that Jones was "very upset," "angry," "frustrated" and "disappointed" because her vehicle had been towed from the parking lot of her

apartment complex after she parked in a handicapped parking space. Although Jones had a parking pass that permitted her to park in the parking lot, she was not authorized to park in a handicapped parking space.

{¶ 6} Jay stated that Jones asked for information regarding the towing company AIY used and that she gave Jones the name and telephone number for the towing company but that she did not have an address for the towing company. Jones told Jay that she had already spoken with the towing company and that she had "had words with them as well."

{¶ 7} Jay testified that her conversation with Jones lasted approximately five minutes and consisted "mostly" of "insults" and "arguments" by Jones that she had "every right to park where she parked." Jay stated that Jones "berate[d]" her, telling her "how terrible our company was and that none of us are basically capable of doing our jobs, things of that nature" and that "her car should not have been towed."

{¶ 8} Jones then told Jay that she was coming to the leasing office, that she was going to "shoot [Jay] and anyone else in the place" and that they would "see her soon." Jay testified that Jones was "very direct" and that she "fear[ed]" and "believe[d]" Jones would do what she said "[b]ecause of how angry she was and how adamant she was that we were at fault."

{¶ 9} Jay testified that she had been "instructed to listen to [tenants] and what they have to say until I feel it's no longer necessary to be cordial . . . in which case I am instructed to end the call and contact the police." Jay told Jones she would

be contacting the police and ended the call. Jay then immediately called the police, reported what had occurred and then locked the doors and closed the blinds. Jay testified that during the three years she had worked at the leasing office, angry tenants would call the office at least once a week but that no one else had ever physically threatened her.

{¶ 10} Mauser testified that, at 10:45 a.m. on October 22, 2022, she responded to a call from a leasing office on Clifton Blvd. regarding "an unhappy tenant that might possibly come and shoot the building up." She stated that when she arrived on scene, Jay informed her that a tenant, i.e., Jones, had called the office upset about her vehicle being towed and had told Jay that she was going to "get a gun and come down" to the office. Mauser indicated that as she took Jay's statement, Jay appeared to be "on edge," "fidgety," "jittery," "constantly scanning," "looking around." Mauser stated that Jay appeared to be "fearful that an incident was going to take place" and that "she feared for her life."

{¶ 11} Mauser testified that Jay explained that AIY has a towing company that monitors all of its properties and that if the towing company observes a violation of the property's parking rules, it will tow the offending vehicle. Jay provided Mauser the contact information for the towing company as well as contact information for Jones, including a copy of her driver's license, from Jones' tenant file, which was in the office.

{¶ 12} Mauser stated that she spoke with the towing company and, after she left the scene, went to Jones' apartment in an attempt to speak with Jones but that Jones was not there.

{¶ 13} Jones testified that in October 2022, she was leasing an apartment in Park Towers, an apartment complex that AIY manages on Lorain Road in Fairview Park. On October 22, 2022, Jones parked her black pickup truck in a handicapped parking space. When she returned to the parking space, her vehicle was gone. Jones testified that a plaque on the building listed a number for a towing company that she then called and inquired as to whether the towing company had towed her pickup truck from Park Towers.

{¶ 14} An unidentified towing company employee informed Jones that the towing company had towed her vehicle because she did not have permission to park on the property. Jones disputed this and claimed that she did, in fact, have permission to park on the property. After going back and forth with the towing company employee regarding the issue, Jones acknowledged that she did not have permission to park in the handicapped parking space but that she did have permission to park at Park Towers because she lived there.

{¶ 15} Jones testified that she "continued to go back and forth" with the towing company employee until the employee told Jones to "shut the eff up." Jones stated that she hung up and immediately called AIY because she had no information regarding where to go to pick up her vehicle and she did not want to continue speaking with the towing company employee.

{¶ 16} Jones testified that she spoke with an AIY employee, i.e., Jay, and asked for information regarding the towing company it uses. Jones stated that Jay told her she could not give her the information because it was a Saturday and that Jones would have to call back on Monday. Jones responded, "Well I guess everybody who deal[s] with AIY is unprofessional." Jones testified that she told Jay about her conversation with the towing company employee and then said to Jay, "Well, you know, people should not talk to people like that about their property. . . . That's why places get shot up." According to Jones, Jay responded, "Well, all right, well you have a good day." Jones replied, "You, too" and hung up. Jones stated that her conversation with Jay lasted "[m]aybe two, three minutes, if that."

{¶ 17} Jones denied that she threatened to "shoot up" AIY employees or threatened to harm any AIY property when she called the leasing office. She stated that she had "no reason to" and that she just wanted to get information regarding the towing company so she could go and get her truck. Jones testified that Jay "never gave [her] any information," so she "had to Google" the name of the towing company to locate its address. Jones stated that 30 minutes later, her sister drove her to the towing company to retrieve her truck. Jones paid a $186 fee, retrieved her truck and went to work.

{¶ 18} When asked why she would say to someone, "[t]hat's why places get shot up," Jones explained:

> [A]s I'm trying to explain to [Jay], she was just dismissing me, and I'm like, "So everybody is just unprofessional, I guess."

And she wasn't really trying to hear — hear me out about the tow company, which was the only problem. Never had an issue with her. . . .

So I'm like, you know, the — you guys see the news and you guys see all these places being shot up and attacked is because of the demeanor of people who's dealing with the public. This is the public. You don't know what someone is going through mentally.

. . .

[S]o I told her what the tow company said. And I said, "You know, people shouldn't talk to people like that. I see why places are being shot up." And that was the end of it.

Jones stated that she "did not intend [her] words at that time to be a threat."

{¶ 19} After hearing the witness testimony and the parties' closing arguments, the trial court found Jones guilty of aggravated menacing. The court explained the reasoning for its verdict as follows:

The question . . . is did you knowingly do that. I don't know. I can't read your mind if you did it or not, knowingly want to cause harm, serious harm, to another. I can't read your mind and nobody can read your mind. I know you were angry at the time.

But there's also no doubt in the Court's mind that [Jay] was in fear, evidenced by the testimony of the officer . . . .

So it gets down to that. Did you knowingly do it? We know that the victim was in fear of her life, so that's the question I had.

And in this day and age, whether it was now or a year ago, I think that you would have that knowledge. You can't even say the words "shoot," "gun," anything like that in this day and age without that ensuing fear in somebody. . . . [T[en years ago, it might have been different. It's not anymore. . . . And there's too many shootings in this world that we live in. And I have to apply . . . the times to the behavior [sic] of the elements.

{¶ 20} The trial court sentenced Jones to 35 days in jail with 30 days suspended and the option of performing five days of community service in lieu of five days in jail. The trial also ordered Jones to complete an anger management program and imposed one year of probation (which would be terminated upon completion of the anger management program and community service), a $100 fine and costs.

{¶ 21} Jones appealed, raising the following assignment of error for review:

> Jones' conviction was based on insufficient evidence, in violation of the Constitutions of Ohio and the United States, because the trial judge expressly stated that he could not determine Jones acted "knowingly" from the evidence in the record and convicted Jones based on his own beliefs about societal trends.

## Law and Analysis

{¶ 22} In her sole assignment of error, Jones challenges the sufficiency of the evidence supporting her conviction for aggravated menacing.

### Standard of Review

{¶ 23} When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The court examines all the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable factfinder of the defendant's guilt beyond a reasonable doubt. *State v. Williams*, 2023-Ohio-2296, ¶ 81 (8th Dist.),

citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring); *see also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

**The Trial Court's Verdict Was Supported by Sufficient Evidence**

{¶ 24} Jones was convicted of aggravated menacing in violation of R.C. 2903.21. R.C. 2903.21(A) states, in relevant part:

> No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . . In addition to any other basis for the other person's belief that the offender will cause serious physical harm to the person or property of the other person, . . . the other person's belief may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

{¶ 25} A person acts "knowingly" "when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Menacing encompasses both "a present state of fear of bodily harm and a fear of bodily harm in the future." *State v. Scott*, 2009-Ohio-4961, ¶ 20 (7th Dist.).

{¶ 26} Jones argues that the trial judge's comments following closing arguments and before he announced his verdict show that (1) there was insufficient

evidence for the trial court to find, beyond a reasonable doubt, that Jones was "aware" that her statements to Jay would "probably" cause Jay to believe that Jones would cause her serious physical harm and (2) the trial judge wrongfully convicted Jones based on "his own beliefs about societal trends" rather than the evidence presented at trial. Jones contends that because the trial judge stated he "d[id]n't know" whether Jones acted knowingly, the trial court should have acquitted Jones. Jones further contends that because the trial court convicted Jones, "based on the [trial judge's] own hypotheses and assertions not in evidence," her conviction was not based on sufficient evidence and should be reversed. We disagree.

{¶ 27} Viewing the trial judge's comments in context, in their entirety, it is clear that his statement that he "didn't know" whether Jones "knowingly" caused Jay to believe that Jones would cause serious physical harm to Jay is simply a recognition that, because he was not inside the defendant's mind, he could not "know" with certainty what the defendant was thinking when she threatened Jay. The trial judge explained: "I don't know. I can't read your mind if you did it or not, knowingly want to cause harm, serious harm to another. I can't read your mind and nobody can read your mind." But that uncertainty does not preclude a finding of guilt. Because a factfinder can never truly get inside the defendant's mind, a factfinder must often resort to circumstantial evidence and the reasonable inferences that can be drawn from that evidence to determine a defendant's mental state. As the trial judge's comments reveal, that is precisely what he did here.

{¶ 28} A factfinder, "'unable to enter the mind of another, is required to consider common sense, causal probabilities in considering whether [a] defendant acted "knowingly."'" *State v. Underwood*, 2024-Ohio-2273, ¶ 85 (4th Dist.), quoting *State v. Kelly*, 2012-Ohio-523, ¶ 23 (11th Dist.).

{¶ 29} The trial testimony revealed that Jones was very upset, angry and frustrated when she called Jay. Jones' truck had been towed and she had just had a very unsatisfactory interaction with the towing company employee regarding the towing. The record reflects that Jones' ire continued to increase during her conversation with Jay and that Jones repeatedly "insult[ed]" and "berate[d]" Jay. Although there is a dispute as to precisely what Jones said to Jay — Jay testified that Jones told her she was going to "shoot [Jay] and anyone else in the place" and that they would "see her soon" while Jones testified that she said only, "That's why places get shot up" — the trial court was entitled to credit Jay's version of events over Jones' version.

{¶ 30} A person is presumed to intend the natural, reasonable and probable consequences of his or her voluntary acts. *See, e.g., State v. Lett*, 2019-Ohio-532, ¶ 19 (8th Dist.). "If a result is a probable consequence of a voluntary act, the actor "'will be held to have acted knowingly to achieve it'" because a person "'is charged by the law with knowledge of the reasonable and probable consequences of his [or her] own acts.'"" *State v. Jacinto*, 2020-Ohio-3722, ¶ 101 (8th Dist.), quoting *State v. Dixon*, 2004-Ohio-2406, ¶ 16 (8th Dist.), quoting *State v. McDaniel*, 1998 Ohio App. LEXIS 2039, *16 (2d Dist. May 1, 1998).

{¶ 31} Jay did not know Jones. While she was very angry and upset, Jones made a direct, overt, unequivocal physical threat to Jones, stating that she would come over "soon" and "shoot" Jay and "anyone else in the place."

{¶ 32} Jones does not dispute that her statement, in fact, caused Jay to believe that Jones would cause her and/or her coworker serious physical harm. Even if Jones had simply made the statement in the heat of the moment and did not actually intend to follow through with her threat, it was not unreasonable for the trial court to conclude, under the circumstances, that Jones was "aware" of the "probable" effect her words would have on Jay and to find, beyond a reasonable doubt, that Jones knowingly caused Jay to believe that she would cause serious physical harm to Jay or her coworker. *See, e.g., Scott*, 2009-Ohio-4961, at ¶ 5, 18-23 (7th Dist.) (sufficient evidence supported defendant's conviction for aggravated menacing where defendant threatened to shoot up the police department; that defendant threatened the entire police department did not change the fact that she caused the detective to believe she would cause serious physical harm to him as a member of the department); *State v. Perkins*, 2006-Ohio-3678, ¶ 11-17 (8th Dist.) (evidence was sufficient to support defendant's conviction for aggravated menacing where traffic controller testified that he was issuing a parking ticket when defendant began swearing at him and saying that he should shoot him and, two days later, defendant again swore at him and threatened him); *cf. State v. Johnson*, 2007-Ohio-5604, ¶ 20-27 (9th Dist.) (defendant's conviction for aggravated menacing was not against the manifest weight of the evidence where witnesses testified that while

defendant was waiting for his girlfriend to get her things, he yelled at them and threatened to kill them, and that they were fearful of defendant because of his angry and aggressive demeanor when making his threats).

{¶ 33} Likewise, it was not improper for the trial court to view Jones' statement through the lens of common sense and experience in making that determination, as it did here. Circumstantial evidence involves proof of facts through direct evidence from which a factfinder may infer other facts in accordance with experience and common sense. *See, e.g., State v. Goldner*, 2024-Ohio-1854, ¶ 40 (11th Dist.); *State v. Kunzer*, 2019-Ohio-1042, ¶ 11 (3d Dist.).

{¶ 34} It is not an element of aggravated menacing that the offender intend to carry out his or her threat. *Perkins* at ¶ 14. A person can be convicted of aggravated menacing even though the person has not made any movement toward carrying out the threat. *Id.*

{¶ 35} The effect Jones' threat had on Jay was reasonable and should have been reasonably anticipated by Jones. Indeed, Jones said nothing to abate her threat (or Jay's fear after hearing Jones' threat) even after Jay informed Jones she would be contacting the police.

{¶ 36} Viewing the evidence in the light most favorable to the city, we conclude that the evidence presented, including the reasonable inferences that could be drawn therefrom, was more than sufficient for a reasonable trier of fact to find Jones guilty of aggravated menacing. Jones' assignment of error is overruled.

{¶ 37} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Lakewood Municipal Court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
LISA B. FORBES, J., CONCUR